| | |
|---|---|
| **TRINITY INDUSTRIES, INC.,** ) | **CIVIL ACTION NO. 08-1498** |
| **TRINITY INDUSTRIES RAILCAR** ) | |
| **CORPORATION,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| ) | |
| **v.** ) | |
| ) | |
| **GREENLEASE HOLDING COMPANY,** ) | |
| **AMPCO-PITTSBURGH** ) | |
| **CORPORATION,** ) | |
| ) | |
| **Defendants,** ) | |

## OPINION

Conti, Chief District Judge.

### I. Introduction

The issues before the court in this opinion are whether defendant Ampco-Pittsburgh

Corporation ("Ampco") can be held *directly* liable for *its* actions or *derivatively* liable for the

actions of its subsidiary, defendant Greenlease Holding Company ("Greenlease") with respect to

enumerated claims raised in connection with a manufacturing plant, located at 60 Union Street,

Greenville, Mercer County, Pennsylvania (the "North Plant"), which previously was owned by

Greenlease and currently is owned by plaintiffs Trinity Industries, Inc. ("Trinity Industries") and

Trinity Industries Railcar Corporation ("Trinity Railcar") (together, "Trinity" or "plaintiffs").

These issues were raised in cross- motions for summary judgment filed by Trinity (ECF No.

151), and Ampco (ECF No. 147).

### II. Procedural History

On October 24, 2008, Trinity filed a complaint against Greenlease and Ampco setting forth the following claims:

- count I seeking cost recovery under § 107 under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*;

- count II seeking contribution under §§ 113(f)(1) and 113(f)(3)(B) of the CERCLA;

- count III seeking recovery under § 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*;

- count IV seeking recovery under section 1101 of the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 PA. CONS. STAT. § 6020.101 *et seq.*;

- count V seeking recovery under sections 701 and 702 of the HSCA;

- count VI seeking contribution under section 705(c)(2) of the HSCA;

- count VII seeking contribution under Pennsylvania state law; and

- count VIII setting forth a state law claim for negligence per se.

(ECF No. 1.)

On October 30, 2013, Ampco filed a motion for summary judgment seeking a judgment in its favor with respect to all counts of the complaint arguing that as a matter of law, it is not directly liable under any claim or derivatively liable for the alleged acts of Greenlease with respect to North Plant. (ECF No. 143.) On the same day, Trinity filed a partial motion for summary judgment arguing, among other things, that it is entitled to summary judgment on its claims against Ampco because Ampco operated the North Plant and piercing of the corporate veil is warranted under the applicable statutes and case law. (ECF No. 151.) On November 4, 2013, Ampco filed a response in opposition to Trinity's partial motion for summary judgment, (ECF No. 209), and Trinity filed a response in opposition to Ampco's motion for summary judgment, (ECF No. 212). On November 7, 2013, Trinity filed a reply brief to Ampco's brief in

opposition to its partial motion for summary judgment, (ECF No. 219), and Ampco filed a reply brief to Trinity's brief in opposition to its motion for summary judgment, (ECF No. 221). On November 12, 2013, Ampco filed a combined concise statement of facts with respect to its motion for summary judgment, (ECF No. 223), and Trinity filed a combined concise statement of fact with respect to plaintiffs' motion for summary judgment, (ECF No. 224).

On December 19, 2013, the court held a hearing with respect to the Ampco's and Trinity's motions for summary judgment limited to the issue whether Ampco may be held liable to Trinity as a matter of law. The court—based upon its review of the submissions of Ampco and Trinity and the arguments presented at the hearing—determined Ampco's motion for summary judgment should be granted and Trinity's motion for summary judgment should be denied. This opinion sets forth the reasoning for the court's decision.

### III. <u>Background</u>[1]

#### A. **Greenville and Ampco**

In or about 1910, Greenville Steel Car Company ("Greenville") began operating a railcar manufacturing facility at the North Plant. (Ampco's Combined Statement of Fact ("ACSOF") ¶ 1.) Greenville was originally organized as the Greenville Metal Products Company. (<u>Id.</u> ¶ 2.) In 1914, the company adopted the name Greenville Steel Car Company. (<u>Id.</u>) In 1924, Greenville Steel Car Company was formally chartered in the Commonwealth of Pennsylvania. (<u>Id.</u>) In August 1937, Pittsburgh Forging Company ("PFC") purchased all Greenville's stock. (<u>Id.</u> ¶ 3.)

In or about October 1979, Ampco acquired all PFC's stock through a wholly-owned acquisition subsidiary, Ampco-Pittsburgh Securities I Corporation. (ACSOF ¶ 4.) On December 29, 1983, Greenville declared a dividend to PFC of the stock of Greenville's then subsidiary,

---

[1] Other factual matters of record will be discussed in context when pertinent to a particular issue.

Greenville Leasing Company, which was an entity that leased railcars. (Id. ¶ 6.) On that same day, PFC declared a dividend to Ampco-Pittsburgh Securities I Corporation of the stock of PFC's then subsidiary, Greenville, making Ampco-Pittsburgh Securities I Corporation the sole shareholder of Greenville. (Id. ¶ 5.) In January 1984, PFC changed its name to GLC Holding Company. (Id. ¶ 7.) On December 21, 1984, the stock of GLC Holding Company was purchased by GATLX Leasing Corporation. (Id. ¶ 8.) In 1985, Ampco-Pittsburgh Securities I Corporation was merged into Ampco, making Ampco the sole shareholder of Greenville. (ACSOF ¶ 10.)

**B. Greenville's Operation of the North Plant**

Greenville's employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting, abrasive blasting, welding, and fabrication operations. (ACSOF ¶ 20.) For example, Greenville's management met with paint manufacturers to discuss what changes needed to be made to the paint that Greenville used in order to ensure the paint would meet new standards and regulations coming into effect. (Id. ¶ 21.) William C. Bubeck ("Bubeck"), director of safety and security for Greenville, communicated with the Pennsylvania Department of Environmental Protection (the "DEP"), formerly known as the Pennsylvania Department of Environmental Resources, with respect to environmental matters including air toxics emissions, PCB transformers, hazardous waste inspections, and alleged violations of the solid waste management act. (Id. ¶ 22.) George Fisher ("Fisher"), plant maintenance engineer for Greenville, communicated with the DEP with respect to environmental matters, including air emissions calculations from the paint booths and hazardous waste notification forms. (Id. ¶ 23.) Fisher was responsible for obtaining information about the DEP's volatile organic compound ("VOC") regulations and disseminating it to the plant. (Id.)

Albert Beers ("Beers") was a Greenville employee from 1965 until 1986. (ACSOF ¶ 24.) While a plant engineer for Greenville, Beers communicated with the DEP with respect to environmental matters, including hazardous waste generator inspections and a permit to construct and use an on-site solid waste incinerator. (Id. ¶ 25.) Beers communicated with outside contractors with respect to off-site disposal of used paint mixtures. (Id. ¶ 26.) After the North Plant was sold in 1986, Gottschall provided documentation to the Environmental Protection Agency with respect to waste Greenville may have sent to an offsite landfill known as the River Road Landfill. (Id. ¶ 33.)

### C. Ampco's Parent-Subsidiary Relationship with Greenville

At all relevant times, Ampco held an ownership interest in various entities, including companies engaged in manufacturing diversified engineered products or industrial equipment, employed only a professional staff, e.g., accountants, actuaries, and lawyers, and did not employ any engineers or persons with technical experience in manufacturing. (ACSOF ¶ 34.)

Between 1979 and 1986, Ampco and Greenville had overlapping board members, but did not share formal corporate office space. (ACSOF ¶¶ 36, 38.) Gottschall, Ed Moores, and John R. Young were overlapping board members from 1979 to 1986, and Ernest Siddons was an overlapping officer from 1984 to 1986. (Id. ¶ 38.) No employees, other than officers and directors, were employees both of Greenville and Ampco. (Id. ¶ 37.) Greenville adopted a resolution that said "any action which the [Ampco] Board, or its Executive Committee, may think necessary and desirable to take on behalf of [Greenville] shall be deemed to be the action of [Greenville's Board]." (Id. ¶ 39.)

Ampco retained the right to approve Greenville's expenditures that exceeded a certain threshold. (ACSOF ¶ 42.) Ampco provided certain high level services to its subsidiaries in the

areas of insurance, legal, banking, and accounting. (Id. ¶ 43.) In 1985, Greenville's pension plan for salaried employees was merged into Ampco's retirement plan. (Id. ¶ 44.) Ampco's retirement plan covered all its subsidiaries for purposes of administration. (Id.) Each subsidiary maintained its separate identity and separate individual plans. (Id.) Ampco used a centralized banking system for all its subsidiaries in order to maximize the amount on which it could obtain interest and either maximize or minimize borrowing amounts. (Id. ¶ 45.) Greenville had its own banking account, account number, and all checks were signed and approved by officers of Greenville. (Id.) Ampco had master insurance policies in order to obtain lower costs and better coverage, in which all subsidiaries, including Greenville, were named insureds. (Id. ¶ 46.) The individual subsidiaries were charged for their pro rata portion of the premium payment. (Id.)

Ampco had bulk services agreements on behalf of its subsidiaries in order to obtain lower prices due to the bulk purchasing capability of the group. (ACSOF ¶ 47.) The actual order placement and payment for such orders would be made in the normal course by the subsidiary, such as Greenville. (Id.) Ampco had a revolving credit agreement with several banks to benefit the entire organization as a whole and on occasion, used the value of its investment in Greenville to guaranty these lines of credit. (Id. ¶ 48.)

### D. The Sale of the North Plant from Greenville to Trinity

As of December 1986, Greenville was solvent. (ACSOF ¶ 52.) On December 9, 1986, Trinity purchased the North Plant from Greenville, pursuant to a Purchase and Sale Agreement, for an $8,000,000 cash payment and in consideration of Trinity's execution of a promissory note in the face amount of $6,075,120 for the benefit of Greenville. (Id. ¶¶ 11, 49.) Ampco, as the sole shareholder of Greenville, authorized the Greenville board of directors to proceed with negotiations and sell the North Plant on terms deemed by Greenville's board to be in the best

interest of Greenville and Ampco. (Id. ¶ 51.) From 1986 until 2000, Trinity operated a railcar manufacturing business at the North Plant as its Greenville Steel Car Division. (Id. ¶ 50.)

### E.  Greenville After the Sale of the North Plant to Trinity

In February 1987, following the sale of the North Plant to Trinity, Greenville maintained a reserve for liabilities in the amount of $250,000 and amended its articles of incorporation to change its name to Greenlease Holding Company. (ACSOF ¶¶ 13, 54; ECF No. 150-1 at 22-23; ECF No. 150-40 at 2.) In or about May 1987, Ampco authorized Greenlease to sell the promissory note directly to Principal Mutual Life Insurance. (ACSOF ¶ 56.) On August 1, 1989, and October 15, 1990, respectively three and four years after Trinity purchased the North Plant from Greenlease, Greenlease issued dividends to Ampco. (Id. ¶ 57.)

### F.  The Criminal Complaint against Trinity with respect to the North Plant

The Commonwealth of Pennsylvania and the DEP, began an investigation at the North Plant based upon allegations that Trinity illegally dumped and disposed of hazardous waste on the site. (ACSOF ¶ 16.) In April 2006—twenty years after Trinity purchased the North Plant from Greenlease—the Commonwealth of Pennsylvania filed a criminal complaint against Trinity asserting three felony counts related to the illegal management of hazardous waste and eight misdemeanor counts related to the illegal dumping and disposal of solid hazardous waste. (Id. ¶ 17.) On October 31, 2006, Trinity[2] entered into a plea agreement with the Pennsylvania Office of Attorney General. (ECF No. 150-19 at 2.) Pursuant to the plea agreement, Trinity was to: (i) plead nolo contendere to five counts of the criminal information filed at CP-43-1655-2006; (ii)

---

[2] The designation of the parties involved in the criminal matter is inconsistent. The plea agreement was entered between the Pennsylvania Attorney General and Trinity Railroad. (ECF No. 150-19.) The Consent Order was entered into between the DEP and Trinity Industries. (ECF No. 150-19 at 31.) The sentence, imposed on December 21, 2006, was against Trinity Industries. (ECF No. 150-19 at 42.)

reimburse the DEP in the amount of $54,502.55 for investigative costs; (iii) pay a $200,000 fine to Pennsylvania's Solid Waste Abatement Fund; (iv) make a $50,000 contribution to a nonprofit organization; and (v) remediate all environmental contamination at the North Plant as set forth in the consent order and agreement attached to the plea agreement. (Id.) Trinity was sentenced on December 21, 2006, in the Court of Common Pleas of Mercer County, pursuant to the consent order and agreement ("Consent Order") entered into by DEP and Trinity on the same day.[3] (ECF No. 150-19 at 5.)

The Consent Order, in pertinent part, provided:

6.    a.    <u>The North Plant and South Plant</u>[4].  Trinity shall obtain prior approval from [the DEP] and conduct the Response Actions in accordance with [the DEP]-approved schedule to fully investigate and respond to the release of hazardous substances at the North Plant and South Plant to attain one or a combination of the Background, Statewide Health, or Site Specific cleanup standards selected by Trinity and approved by [the DEP] pursuant to Chapter 3 of the Land Recycling Act, 35 P.S. §§6026.302-6026.303, for non-residential use.

b.    <u>Contamination migrating from the North Plant or South Plant</u>.  For any release of hazardous substances in groundwater or soil that is migrating from the North Plant and/or South Plant, Trinity shall attain one or a combination of the Background or Statewide Health cleanup standards selected by Trinity, and approved by [the DEP] pursuant to Chapter 3 of the Land Recycling Act, 35 P.S. §§6026.302-6026.303, for non-residential use.

c.    The Response Actions[5] required by Paragraph 6.a. and 6.b., above, shall include, without limitation: paying all fees required under the Land

---

[3] The parties agreed that the Consent Order "is an Order of [the DEP] authorized and issued pursuant to Section 1102 of HSCA, 35 P.S. §6020.1102; Section 104(b) of the Land Recycling Act, 35 P.S. §6026.104(b); and Section 1917-A of the Administrative Code, 71 P.S. §§510-17." (ECF No. 150-19 at 5.)

[4] The Consent Order involves, in addition to the North Plant, the "South Plant," which is not part of this litigation. (See ECF No. 150-19 at 6.)

[5] Under the Consent Order, the term "Response Actions" is defined as follows:

"Response Actions" shall mean any and all of the actions taken or to be taken by [the DEP], Trinity, and/or any other responsible persons under the direction of [the DEP], relating to and addressing the release and threatened release of any hazardous substances at the North Plant and South Plant.  Response Actions

Recycling Act; publishing notices; submitting, revising, and finalizing all required documents for [the DEP]'s approval; and completing and maintaining the Response Actions, including the investigations, remediation, and post-remediation care activities at each Plant, if necessary, in accordance with the Land Recycling Act, any other applicable environmental laws and Regulations, and the requirements of this Consent Order and Agreement.

(ECF No. 150-19 at 11.)

### G. Greenlease and the North Plant—2009 to the Present

As of 2009, Greenlease had positive reserves and equity. (Id. ¶ 58.) Greenlease exists today as a shell holding company and it does not have any employees, business activities, for profit activities, or other commercial undertakings. (Id. ¶ 14.)

The North Plant currently is a non-operating facility held by Trinity's subsidiary Waldorf Properties, Inc. and is contaminated with substances that include, *inter alia*, iron, lead, trichloroethene, xylene, and polychlorinated bi-phenyls ("PCBs") such as "Aroclor." (Trinity's Combined Statement of Facts ("TCSOF") ¶ 1.)

### IV. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 247-48

---

include, but are not limited to: investigations of responsible persons; investigations of environmental conditions at the North Plant and South Plant; investigations of contaminated groundwater, if any, at and potentially migrating from the Plants, including groundwater (if any) that has migrated and contaminated drinking water; actions to respond to the release and threatened release of any hazardous substance at and/or potentially migrating from the North Plant and South Plant; and maintenance of those actions.

(ECF No. 150-19 at 9-10.)

(1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

> The United States Court of Appeals for the Third Circuit has stated:
>
> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

Id. The court may consider material evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed. 1983)); Pollack v. Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

## V. **Discussion**

Trinity is suing Ampco *directly* for "operating" the North Plant and *derivatively* for Greenlease's actions in operating the North Plant by piercing the corporate veil.[6] The Supreme

---

[6] The foregoing discussion refers only to the CERCLA claims (counts I and II) and not the RCRA claim (count III) or the HSCA claims (counts IV and V). The discussion is equally applicable to the RCRA claim and the HSCA claims, however, because those statutes have the same liability schemes as the CERCLA with respect to owners and operators. Agere Sys., Inc. v. Advanced Envtl. Tech. Corp., 602 F.3d 204, 236 (3d Cir. 2010) ("The District Court correctly

Court of the United States in <u>United States v. Bestfoods</u>, 524 U.S. 51 (1998), discussed the law applicable to a parent corporation's *direct* liability for *operating* a plant and *derivative* liability for its *subsidiary's actions* in operating a plant.

With respect to distinguishing a parent corporation's *direct* liability for its *own* action from derivative liability, the Supreme Court explained:

> [D]erivative liability cases are to be distinguished from those in which "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of." Douglas 207, 208. In such instances, the parent is directly liable for its own actions. <u>See</u> H. Henn & J. Alexander, Laws of Corporations 347 (3d ed. 1983) (hereinafter Henn & Alexander) ("Apart from corporation law principles, a shareholder, whether a natural person or a corporation, may be liable on the ground that such shareholder's activity resulted in the liability"). The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent "corporation is [itself] responsible for the wrongs committed by its agents in the course of its business," <u>Mine Workers v. Coronado Coal Co.</u>, 259 U.S. 344, 395, 42 S.Ct. 570, 577, 66 L.Ed. 975 (1922), and whereas the rules of veil piercing limit derivative liability for the actions of another corporation, CERCLA's "operator" provision is concerned primarily with direct liability for one's own actions. <u>See, e.g.</u>, <u>Sidney S. Arst Co. v. Pipefitters Welfare Ed. Fund</u>, 25 F.3d 417, 420 (C.A.7 1994) ("[T]he direct, personal liability provided by CERCLA is distinct from the derivative liability that results from piercing the corporate veil" (internal quotation marks omitted)).

<u>Id.</u> at 64-65.

The Court noted with respect to a corporation's protection from liability for acts of its subsidiary:

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through

---

held that Carpenter's liability "is neither greater nor lesser under the HSCA."…Indeed, the cost recovery and contribution provisions in HSCA are virtually identical to those in CERCLA….Thus, on remand, the District Court should continue to address the CERCLA and HSCA issues in this case identically.); <u>Bd. of Cnty. Commissioners v. Brown Grp. Retail, Inc.</u>, Civ. Action 08-855, 2009 WL 1108463, at *4 (D. Colo. April 24, 2009) ("As the definition of "operator" under RCRA is substantially the same as the definition under CERCLA, a finding that Plaintiff meets the former is sufficient to show Plaintiff meets the latter.").

ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193 (1929) (hereinafter Douglas)

…

Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." Douglas 196 (footnotes omitted).

Bestfoods, 524 U.S. at 60. The Court, however, explained:

[T]here is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.

…

The Court of Appeals was accordingly correct in holding that when (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions.

Id. at 64. Whether Ampco can be *directly* or *derivatively* liable to Trinity will be addressed

below.

## A.  **Direct Liability**

Trinity asserts Ampco is directly liable to Trinity under the following provision of 42

U.S.C. § 9607:

(1) the owner and **operator** of . . . a facility, [or] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . shall be liable for . . . any . . . necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4)(B) (emphasis added). In Bestfoods, the Supreme Court explained:

[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that

is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

Id. at 66-67. The Supreme Court gave the following guidance to aide a court in determining whether a parent "operated" its subsidiary's facility:

> Identifying such an occurrence calls for line-drawing yet again, since the acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points. Just as we may look to such norms in identifying the limits of the presumption that a dual officeholder acts in his ostensible capacity, so here we may refer to them in distinguishing a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." [Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U.L.Q. 223, 282 (1994)]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

Id. at 71-72. The Supreme Court identified three possible scenarios in which a parent corporation could be held directly liable for operating its subsidiary's facility:

> In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate," we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate "operation" as including the exercise of direction over the facility's activities. See *supra*, at [67-8]. The Court of Appeals recognized this by indicating that **a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture**. *See* [U.S. v. Cordova Chemical Co. of Michigan, 113 F.3d 572, 579 (1997)]. We anticipated a further possibility above, however, when we observed that **a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility.** *See* n. 13, supra. Yet another possibility, suggested by the facts of this case, is that **an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility**.

Id. at 71-72 (emphasis added).

Here, Trinity argues that "Ampco's involvement with relevant North Plant operations exceeded anything that could be characterized as a 'normal relationship between parent and subsidiary.'" (ECF No. 152 at 12) (quoting <u>Bestfoods</u>, 524 U.S. at 71). Trinity argues Ampco:

- advised Greenlease regarding the operation of laws and regulations related to Greenlease's waste generation practices;

- monitored Greenlease's waste generation practices;

- authorized its personnel to seek funding for and assist with portions of Greenlease's effort to 'modernize' painting operations at the North Plant after it was evident the operations were causing product releases into the environment;

- had its officers or directors that constituted Greenlease's board make decisions regarding Greenlease's core manufacturing activities by approving leases or customer financing for railcars that were manufactured at the North Plant; and

- had its officers submit filings to the Commonwealth wherein they acted as if they did not recognize a meaningful distinction between Ampco and Greenlease, because Ampco referred to the changing of "*our* name from Greenville Steel Car Company to Greenlease Holding Company."

(ECF Nos. 212; 224.) Trinity argues that Ampco personnel—Fisher and Beers—believed Ampco owned the North Plant or "otherwise had an intimate connection to operations at the North Plant." (ECF No. 212 at 3.) Based upon the foregoing evidence, Trinity asserts that Ampco "operated" the North Plant and can be held *directly* liable for its actions in doing so. Ampco argues that the evidence of record is insufficient for a reasonable jury to conclude that Ampco's involvement with the North Plant was "eccentric under accepted norms of parental oversight of a subsidiary's facility." <u>Bestfoods</u>, 524 U.S. at 72.

The arguments and evidence presented by the parties do not support the argument that Ampco's involvement with the North Plant was outside the bounds of a normal parent-subsidiary relationship. First, there is no dispute that Greenville employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting,

abrasive blasting, welding, and fabrication operations. (ACSOF ¶ 20.) Beers communicated with outside contractors regarding off-site disposal of used paint mixtures. (Id. ¶ 26.) Bubeck, director of safety and security for Greenville, communicated with the DEP regarding environmental matters including air toxics emissions, PCB transformers, hazardous waste inspections and alleged violations of the solid waste management act. (Id. ¶ 22.) Fisher, plant maintenance engineer for Greenville, communicated with the DEP regarding environmental matters, including air emissions calculations from the paint booths and hazardous waste notification forms. (Id. ¶ 23.) Fisher was responsible for obtaining information about the Environmental Protection Agency's VOC regulations and disseminating it to Greenville employees. (Id.) Beers, as plant engineer for Greenville, communicated with the DEP regarding environmental matters, including hazardous waste generator inspections and a permit to construct and use an on-site solid waste incinerator. (Id. ¶ 25.) Most significantly, during the relevant time period, Ampco employed only a professional staff, such as accountants, actuaries, and lawyers, and did not employ any engineers or persons with technical experience in manufacturing that could make decisions for Greenville with respect to environmental compliance or waste management. (Id. ¶ 34.)

There is no dispute that Gotschall provided free legal advice to Greenville during the relevant time period. Courts have recognized, however, that it is within the normal bounds of a parent-subsidiary relationship for a parent corporation to provide in-house legal counsel to its subsidiaries. Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., Civ. Action No. 00-2447, 2003 WL 21542491, at *5 (N.D. Ill. July 3, 2003) ("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family."); Schiavone v. Pearce, 77 F. Supp. 2d 284, 290 (D. Conn. 1999) (finding that a parent was not directly liable under CERCLA where the subsidiary used the parent's legal department).

With respect to Ampco's monitoring of Greenlease's waste generation services, the Supreme Court in <u>Bestfoods</u> noted that a parent corporation's monitoring of its subsidiary's performance does not give rise to direct liability for the parent corporation. <u>Bestfoods</u>, 524 U.S. at 72. Ampco being interested in and paying close attention to Greenlease's waste disposal, therefore, is not sufficient to support Ampco being directly liable for the activities of the North Plant. As noted, Ampco only employed a professional staff and under that circumstance, its involvement in the waste generation services could not give rise to an *eccentric* parent-subsidiary relationship.

The approval by Ampco's officers or directors, who served on Greenlease's board of directors, of leases or customer financing for railcars that were manufactured at the North Plant is insufficient evidence to support Ampco's direct liability for the North Plant. In <u>Bestfoods</u>, the court noted that "[s]ince courts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary'…it cannot be enough to establish liability [where] dual officers and directors made policy decisions and supervised activities at the facility." <u>Bestfoods</u>, 524 U.S. at 69 (quoting PHILLIP I. BLUMBERG, THE LAW OF CORPORATION GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS § 1.02.1 at 12 (1983)). In order to prevail at the summary judgment stage, Trinity would have to adduce evidence to show that the dual officers and directors were acting only in their capacities as directors and officers of Ampco when they committed those acts. <u>Bestfoods</u>, 524 U.S. at 70 ("The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts."). The Court in <u>Bestfoods</u> did not describe in detail how a party could rebut the presumption, but explained:

> We do not attempt to recite the ways in which the Government could show that dual officers or directors were in fact acting on behalf of the parent. Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

Bestfoods, 524 U.S. at 70 n.13. Here, Trinity did not point to evidence to show that Ampco's officers or directors acted on Greenlease's board in any way that was "plainly contrary to the interests of [Greenlease] yet nonetheless advantageous to [Ampco]." Id. Trinity, therefore, failed to rebut the presumption that the dual officers and directors acted in their capacity as Greenlease board members and to show they acted solely as officers or directors of Ampco.

The reference by John Young, an Ampco officer, to the name Greenlease as "our name" in a letter to the Commonwealth of Pennsylvania is not sufficient to support a direct liability claim against Ampco. Ampco owned all shares of Greenlease. It is not out of the bounds of a normal parent-subsidiary relationship for an Ampco officer to use a possessive to refer to the subsidiary's name.

The authorization by Ampco personnel to seek funding for and to assist with portions of Greenlease's effort to 'modernize' painting operations at the North Plant after it was evident the operations were causing product releases into the environment, is likewise not sufficient to support a direct liability claim against Ampco. Trinity cites to exhibits 315, 316, 317, and 318 in support of this evidence.

With respect to exhibits 315 and 316, Ampco argues:

> Trinity's characterization [of the documents cited] is misleading because Trinity conflates two separate projects. Trinity's Exhibits 315 and 316 refer to Greenville minutes approving an appropriation request for a spray booth project that was part of an overall modernization that was approved by the Greenville board in 1976, prior to the acquisition by Ampco of Greenville's parent PFC's stock in 1979.

> Neither exhibit evidences that "Ampco authorized and allowed its personnel to seek funding for and assist" Greenville's effort in this spray booth project.

(ECF No. 224 at 27-28.) To the extent Greenville approved the modernization plan, Ampco's subsequent approval of the expenditure to fund the spray booth and modernization plan is not a basis to find Ampco directly liable for operating the North Plant. Fletcher v. Atex, Inc., 68 F.3d 1451, 1459 (2d Cir. 1995) (finding a parent's approval for major capital expenditures was "typical of a majority shareholder or parent corporation") (citing Phoenix Canada Oil Co. v. Texaco, 842 F.2d 1466, 1476 (3d Cir. 1988)). Exhibit 315, board minutes of Greenville from August 31, 1979 (prior to its acquisition by a subsidiary of Ampco), shows that the board on August 15, 1979, approved an expenditure of $330,000 for a spray paint booth improvement at Greenville. (ECF No. 193-3 at 6.) The approval of the spray paint booth expenditure was part of an overall modernization project the Greenville's board of directors approved totaling $1,394,000. (Id. at 7.) Exhibit 316 is the board minutes from the August 15, 1979, board meeting at which the board approved the expenditure for the spray paint booth. (ECF No. 193-4.) Ampco's subsequent approval of the major capital expenditure, i.e., the spray paint booth and the modernization as a whole, was within the bounds of a normal parent-subsidiary relationship and does not support a reasonable jury finding that Ampco operated the North Plant.

Exhibit 317 is a "Plan to Increase Production Capacity." (ECF No. 193-5.) Exhibit 318 is an inter-office correspondence showing Gotschall—an officer of both Ampco and Greenville—attended a meeting and told the meeting participants, which included at least three other persons from Greenville, about the plan to increase Greenville's production capacity. (ECF No. 194-1.) With respect to exhibits 317 and 318, Ampco argues:

> Trinity's Exhibits 317 and 318 refer to a 'Greenville Steel Car Company Plan to Increase Production Capacity." **This plan was never implemented. Trinity's Exh. 7 at p. 62.** Further, Mr. Gottschall, a dual officer for both Greenville and

> Ampco, was the only person with a connection to Ampco who attended a meeting in Washington DC regarding Greenville's Plan. Trinity's App. Exh. 318; Ampco's App. Exhs. 30 and 31.

(ECF No. 224 at 29) (emphasis added.) The parties did not provide the court the page of Siddons' deposition, i.e., Trinity's exhibit 7, page 62, that Ampco refers to as evidence that the plan to increase capacity was never implemented. Trinity provided page 61 of Siddons' deposition. The last question on that page reads: "Whatever came of that process? Was it something that was implemented? Help me understand?" (ECF No. 155-4 at 15.) The very next page of the deposition, i.e., page 62, is not included in the record. It is difficult to understand how exhibits 317 and 318 support Trinity's position. The plan to increase capacity appears to be authored by Greenville. Although Gottschall is listed as a representative of Ampco in the meeting notes in exhibit 318, he is an officer of Greenville. Under those circumstances, exhibits 317 and 318 are insufficient to show Ampco operated the North Plant.

A reasonable jury based upon the evidence of record could not conclude that Ampco's actions with respect to North Plant were "eccentric under accepted norms of parental oversight of a subsidiary's facility." Bestfoods, 524 U.S. at 72. For this reason, Ampco's motion for summary judgment with respect to Trinity's direct liability claims will be granted and Trinity's partial motion for summary judgment with respect to Trinity's direct liability claims will be denied.

B. **Derivative Liability**[7]

The second issue before the court is whether Ampco may be held derivatively liable for Greenlease's actions in operating the North Plant. "Corporate veil-piercing has been approved in the context of CERCLA actions. The contours of alter ego liability in this context are determined

---

[7] The veil piercing principles are similar under federal and Pennsylvania law. See United States v. Union Corp., 259 F.Supp.2d 356, 389 (E.D. Pa. 2003) (citing Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978)). The foregoing discussion is, therefore, equally applicable with respect to Trinity's state law claims.

by federal common law." <u>United States v. Union Corp.</u>, 259 F. Supp. 2d 356, 388 (E.D. Pa. 2003) (citing <u>Bestfoods</u>, 524 U.S. at 63-64.) Under the Court of Appeals for the Third Circuit's alter ego test, a parent company's derivative liability is determined in light of eight non-exclusive factors: (i) its subsidiary's gross undercapitalization for its purpose, (ii) failure to observe corporate formalities; (iii) nonpayment of dividends; (iv) the insolvency of the subsidiary; (v) siphoning of funds of the corporation by the dominant stockholder; (vi) nonfunctioning of other officers or directors; (vii) absence of corporate records; and (viii) whether the corporation is merely a facade for the operations of the dominant stockholder or stockholders. <u>United States v. Pisani</u>, 646 F.2d 83, 88 (3d Cir. 1981). The situation "must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness." <u>Id.</u> No single factor is dispositive; rather, a determination on veil-piercing is to be made based on the totality of the circumstances. <u>Id.</u> Piercing the corporate veil "does not require proof of actual fraud." <u>Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk</u>, 332 F.3d 188, 194 (3d Cir. 2003). Alter ego theory, however, "has elements of fraud theory, [so] it too must be shown by clear and convincing evidence." <u>Id.</u> at 192. The alter ego factors relevant to this case that were addressed by Trinity and Ampco and the evidence of record with respect to those factors are discussed below.

1. **<u>Subsidiary's gross undercapitalization for its purpose; siphoning of funds of the corporation by the dominant stockholder</u>**

Trinity argues that "Ampco's siphoning of funds from Greenlease once Greenlease became a non-operating subsidiary warrants veil piercing" in this case because it left Greenlease undercapitalized and shows Ampco's dominion and control over Greenlease. (ECF No. 152 at 20; ECF No. 212 at 7.) Ampco argues that at all relevant times, Greenlease was adequately

capitalized in light of the liabilities known to Ampco, and, therefore, veil piercing is not warranted in this case. (ECF No. 209 at 7.)

The general rule is gross undercapitalization is to be analyzed according to the subsidiary's initial capitalization. Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 197 (3d Cir. 2003) ("[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business"). The relevant inquiry with respect to whether a subsidiary is grossly undercapitalized is whether the corporation's "resources [are] reasonable 'in relation to the nature of the business of the corporation and the risks attendant to such businesses.'" Pharmacia Corp. v. Motor Carrier Servs. Corp., 309 F. App'x 666, 672 (3d Cir. 2009). Trinity argues that veil piercing is warranted "when a non-operating subsidiary is drained of assets that could have been used to satisfy its liabilities—particularly when the assets could have been used to satisfy environmental liabilities." (ECF No. 152 at 19-20.) As pointed out by Ampco, however, piercing the corporate veil is warranted based upon the siphoning of a subsidiary's assets only when the parent has *knowledge* of the subsidiary's liabilities when the assets are siphoned from the subsidiary. ITT Corp. v. Borgwarner Inc., Civ. Action No. Civ. Action No. 05-674, 2009 WL 2242904, at *7 (W.D. Mich. July 22, 2009) ("Evidence that a parent corporation drained a subsidiary of its assets so that the subsidiary could not meet its known environmental liabilities might well provide a basis for piercing the corporate veil. However, Plaintiff would have to show both knowledge of environmental liabilities and a removal of assets to avoid those liabilities.").

Here, the undisputed evidence of record in this case shows:

- Greenlease operated the North Plant until it was sold to Trinity in 1986. Up until that time, the company was solvent;

- After the sale of the North Plant to Trinity, Greenlease existed as a shell holding company without any business activities, for profit activities, or other commercial undertakings, did not have any employees, and held $250,000 in reserve for liabilities;

- In 1989 and 1990, respectively three and four years after Greenlease sold the North Plant to Trinity, Greenlease issued dividends to Ampco, leaving the $250,000 in reserve. At that time, Greenlease's alleged liability with respect to the North Plant was not *known* to Ampco or Greenlease.

This evidence shows that Greenlease was not knowingly grossly undercapitalized because at the time it issued dividends to Ampco, it was a shell corporation, and there is no evidence of record that at a time of the issuance of the dividends, Ampco knew about the liabilities at issue in this case. As Ampco points out, the facts of this case are unlike the facts in the decisions cited by Trinity. In those decisions, the parent corporations were *aware* of the liabilities of the subsidiary corporations at the time the parent corporations siphoned funds from the subsidiary corporations. Pharmacia, 309 F. App'x at 672 (holding the subsidiary's assets were not reasonable in relation to the nature of its business "given its lack of revenue and acknowledged responsibility under the Agreement for (at least some) environmental contamination"); Bernardin, Inc. v. Midland Oil Corp., 520 F.2d 771, 775 (7th Cir. 1975) (affirming district court's decision that "the equities among the parties required and dictated [the plaintiff's] recovery from [the parent corporation defendant] which had taken over and acquired all that [its subsidiary] had had to offer its creditors."); Union Corp., 259 F. Supp. 2d at 390 ("Where the conduct of a dominant corporation is deliberate, with the specific intent to escape liability for a specific tort or class of torts, corporate veil piercing is justified. The court finds that Union's actions were a deliberate attempt to evade anticipated liability for contamination of the Cottman Property." (internal quotations marks and citations omitted)); Waykesha v. Viacom,

Int'l Inc., 404 F.Supp.2d 1112, 1119 (E.D. Wis. 2005) (holding piercing the corporate veil was warranted because "[parent corporation] evaded its obligation to pay for its share of liability at the West Avenue Landfill by manipulating [the subsidiary] during the 1996 asset sale."); AT&T Global Info. Solutions Co. v. Union Tank Car Co., 29 F.Supp.2d 857, 869 (S.D. Ohio 1998) (finding piercing the corporate veil was warranted where the parent corporation "owned all the relevant assets of [the subsidiary] from whom they profited for many years" when the subsidiary violated the CERCLA); see Crane v. Green & Freedman Baking Co., 134 F.3d 17, 23 (1st Cir. 1998) ("wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress ... can justify piercing the corporate veil"); United States v. Golden Acres, 702 F. Supp. 1097, 1106 (D. Del. 1988) ("[D]efendants were siphoning funds out of the corporation at regular intervals . . . [d]espite a mounting mortgage debt and an insolvent corporate shell.").

As noted, there is no evidence of record that Ampco knew about the environmental liabilities at issue in this case at the time the dividends were issued. Greenlease was not a operating company at the time it paid dividends to Ampco, and it was not knowingly grossly undercapitalized by Ampco. There is no evidence that at that time Greenlease or Ampco knew about liabilities of Greenlease that could exceed the $250,000 in reserve. Based upon the foregoing, the issuance of the dividends by Greenlease to Ampco approximately eighteen years prior to the commencement of this litigation is not a sufficient basis for piercing the corporate veil in this case.

Trinity cites Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC, 402 F. App'x 623 (2d Cir. 2010), in support of its argument that "the siphoning off of funds from on entity to another can be probative of the domination exerted by one entity over another, especially when

there is no commercially reasonable explanation for the transfer of assets." (ECF No. 212 at 7.) In this case, however, the undisputed evidence of record shows that Greenelease made the dividend payments to Ampco and left $250,000 in reserve for liabilities following the sale of the North Plant because Greenlease was a nonoperating company with no *known* liabilities exceeding the $250,000 in reserve at that time. Trinity did not point to evidence of record to show Ampco "siphoned" any of Greenlease's funds during the time when Greenlease operated North Plant. The payments which Trinity is concerned about in this case, i.e., the dividend payments issued approximately eighteen years prior to the initiation of this case *and* after Greenlease sold all its assets, do not qualify as payments for which the is no commercially reasonable explanation. To the contrary, it would be unreasonable for Ampco to leave Greenlease's earnings from the sale of the North Plant in an account when at the time the dividends were issued Greenlease was a nonoperating company with no *known* liabilities exceeding the $250,000 in reserve. Accordingly, no reasonable jury could find Greenlease was grossly undercapitalized or that Ampco siphoned funds from Greenlease at any time relevant to this case.

2. **Nonfunctioning of other officers or directors**

Trinity alleges that Ampco dominated Greenlease because it "stocked" the Greenlease board of directors with people from the pool of Ampco's directors and officers. (ECF No. 152 at 20.) The Supreme Court has made clear, however, "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." Bestfoods, 524 U.S. at 69. Since courts generally presume "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary,…it cannot be enough to establish liability…that dual officers and

directors made policy decisions and supervised activities at the [subsidiary]."[8] Id. A party arguing in favor of piercing the corporation veil must point to evidence to show the directors purportedly acting for the benefit of the subsidiary corporation were—in actuality—acting solely for the benefit of the parent corporation. The Supreme Court in Bestfoods did not "attempt to recite the ways in which [a party] could show that dual officers or directors were in fact acting on behalf of the parent[,]" but, as previously noted, stated:

> Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

Bestfoods, 524 U.S. at 70 n.13.

Greenlease's board of directors was comprised entirely of persons from the pool of Ampco's directors and officers; indeed, several of Greenlease's officers came from that pool as well. Greenlease's board of directors passed a resolution providing that Greenlease would be deemed to have adopted any action Ampco thought necessary and desirable to take on behalf of Greenlease. Notably, there is no evidence that Greenlease in fact deemed adopted any such action or that Ampco exercised any power under that resolution.

As stated by the Supreme Court, "it cannot be enough to establish liability…that dual officers and directors made policy decisions and supervised activities at the [subsidiary]." Bestfoods, 524 U.S. at 69. Trinity has the burden to show that the directors of both corporations were acting solely for the benefit of Ampco when they made decisions for Greenlease. Trinity

---

[8] While this statement was made in the context of a direct liability analysis, courts have applied this principle when determining derivative liability as well, making this distinction inconsequential. Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001).

did not point to any evidence of record to show that any measure adopted by Greenlease ran contrary to Greenlease's best interests or that the conduct of the directors was contrary to "norms of corporate behavior."[9] <u>Bestfoods</u>, 524 U.S. at 70 n.13. Under those circumstances, this factor, i.e., the nonfunctioning of other officers or directors, does not weigh in favor of piercing the corporate veil in this case.

3. **Whether the corporation is merely a facade for the operations of the dominant stockholder or stockholders.**

Trinity argues that Greenlease and Ampco "comingled" their assets and that Ampco provided Greenlease with several "free" services, such as legal and accounting services, insurance policies, and employee benefit plans. Plaintiffs did not cite to any decision that suggests the provision of these services from a parent to a subsidiary runs afoul of normal corporate behavior. To the contrary, courts have held legal and accounting services, <u>Catalina Mktg.</u>, 2003 WL 21542491, at *5, the provision of employee benefit plants, <u>Wehner v. Syntex Agribusiness, Inc</u>., 616 F. Supp 27, 30 (E.D. Mo. 1985), and a centralized cash management system where accounting records reflect the indebtedness of one entity to another, <u>In re Acushnet River & New Bedford Harbour Proceedings</u>, 675 F. Supp. 22, 34 (D. Mass. 1987), are consistent with the normal parent-subsidiary relationship. No reasonable jury could, therefore, find that based upon Ampco providing Greenlease with legal and accounting services, insurance policies, and employee benefit plans warrants piercing the corporate veil in this case.

4. **Policy Considerations**

Trinity argues that "Ampco's actions threaten to circumvent the fundamental purposes of CERCLA, HSCA, and RCRA." (ECF No. 212 at 9.) Trinity argues those statutes are meant to

---

[9] It is "assumed to be the norm that a parent will have not only . . . the potential to exercise control [over the subsidiary], but to exercise it to a substantial degree." <u>Craig v. Lake Asbestos of Quebec, Ltd</u>., 843 F.2d 145, 150 (3d Cir. 1988).

reach as far back into the past as necessary to identify those responsible for the harm, and, therefore, Ampco should be held responsible for the alleged harm in this case. Trinity's argument lacks merit, however, because based upon the foregoing discussion, Ampco is not *directly* responsible or *derivatively* responsible for the harm caused at the North Plant. Piercing of the corporate veil is, therefore, not warranted in this case.

5. **Conclusion**

Based upon the foregoing discussion, Trinity failed to show by *clear and convincing* evidence that Greenville was an alter ego of Ampco. Ampco may have, among other things, retained oversight over Greenville, shared officers and directors between the two corporations, and approved large expenditures for Greenville, but the evidence of record is insufficient for a reasonable jury to find an element of injustice or fundamental unfairness in this case warranting piercing of the corporate veil. Greenville—while an active corporation—was never knowingly grossly undercapitalized by Ampco or was insolvent. Greenlease had its own employees, separate bank account number, and carried on its responsibilities as an entity separate and apart from Ampco. There is no evidence of record to show Ampco knew about North Plant's liabilities when Greenlease, a nonoperating company with no employees, paid Ampco dividends in 1989 and 1990. Under those circumstances, Trinity's motion for summary judgment will be denied with respect to its claims against Ampco. Ampco's motion for summary judgment will be granted with respect to those claims.

C. **Common Law Claims—Negligence Per Se and Contribution**

The law concerning negligence per se "is so well established as to be beyond cavil." C.C.H. v. Phila. Phillies, Inc., 596 Pa. 23, 940 A.2d 336, 347 n. 17 (Pa. 2008). In In re

Reglan/Metoclopramide Litigation, 81 A.3d 80, 94 n.13 (Pa. Super. Ct. 2013), the court explained:

> Pennsylvania recognizes that the standard of care may be prescribed by legislative enactment so that "a violation of the statute or ordinance may serve as the basis for negligence per se." Wagner v. Anzon, Inc., 453 Pa.Super. 619, 684 A.2d 570, 574 (1996). The plaintiff must show: (1) that the purpose of the statute is "at least in part, to protect the interest of a group of individuals, as opposed to the public generally;" (2) that the statute clearly applies to the conduct of the defendant; (3) that the defendant violated the statute; and (4) that the violation was the proximate cause of the plaintiff's injuries. 684 A.2d at 574.

Id.

Here, Trinity argues Ampco was negligent because it violated the HSCA. In other words, the HSCA establishes the "duty" owed by Ampco, and the violation of that provision constitutes a breach of Ampco's duty of care. See Keifer v. Reinhart Foodservices, LLC, Civ. Action Nos. 09-1187, 09-1558, 2012 WL 368047, at *5 (W.D. Pa. Feb. 1, 2012) (citing Cabiroy v. Scipione, 767 A.2d 1078, 1079 (Pa. Super. Ct. 2001)). Summary judgment will be entered in favor of Ampco with respect to Trinity's claims for negligence per se because Ampco—based upon the foregoing discussion—cannot be found to have violated the HSCA[10] as a matter of law. Trinity's negligence per se claim, therefore, fails as a matter of law because Trinity is unable to establish liability on the part of Ampco.

Because Trinity cannot establish Ampco was either directly or derivatively liable for the harm alleged in this case, a reasonable jury could not find Ampco responsible for contribution to Trintiy. United States v. Zarra, Civ. Action No. 10-811, 2011 WL 3667313, at *4 (W.D. Pa. Aug. 22, 2011) ("A claim for contribution based upon negligence is only proper when it arises between joint tortfeasors.") (citing Nat'l R.R. Passenger Corp. v. URS Corp., 528 F.Supp.2d 525, 531 (E.D. Pa. 2007). In other words, a reasonable jury could not find Trinity and Ampco are joint

---

[10] See footnote 6 supra.

tortfeasors with respect to the North Plant. Under those circumstances, Trinity is not entitled to contribution from Ampco as a matter of law. Summary judgment will be entered in favor of Ampco with respect to Trinity's claim for negligence per se and the request for contribution.

## VI. Conclusion

For the reasons stated in this opinion and on the record at the hearing on December 19, 2013, Ampco's motion for summary judgment (ECF No. 147) will be GRANTED, and Trinity's partial motion for summary judgment (ECF No. 151) will be DENIED with respect to its claims against Ampco.

An appropriate order will be entered.

Dated: May 2, 2014                                    By the court,

                                                      /s/ JOY FLOWERS CONTI
                                                      Joy Flowers Conti
                                                      Chief United States District Judge