**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TRINITY INDUSTRIES, INC.,⠀⠀⠀⠀)
TRINITY INDUSTRIES RAILCAR⠀)
CORPORATION,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀CIVIL ACTION NO. 2:08-1498
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
GREENLEASE HOLDING⠀⠀⠀⠀)
COMPANY,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

**MEMORANDUM OPINION**

**Conti, Chief District Judge**

## I.⠀⠀Introduction

The instant action arises out of the contamination of real property caused by the use of hazardous substances and waste in connection with the operation of a railcar manufacturing facility. Pending before the court are cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 143 & 151.) For the reasons that follow, each of those motions will be granted in part and denied in part.

## II.⠀⠀Background

### A.⠀General

In 1910, Greenville Metal Products Company ("GMPC") purchased the North Plant, which is located in Mercer County, Pennsylvania. (ECF No. 224 ¶¶ 1-2.) The North Plant consists of thirty-four acres found within the Borough of Greenville. (ECF No. 223 ¶ 1.) GMPC started to operate the North Plant as a facility to manufacture railcars. (ECF No. 222 ¶ 1.) In 1914, GMPC became known as the Greenville Steel Car Company ("Greenville"). (*Id.* ¶ 2.) It

was formally incorporated in Pennsylvania on December 31, 1924.  (ECF No. 146-5 at 1.)  In August 1937, Pittsburgh Forgings Company ("PFC") purchased all of Greenville's stock.  (ECF No. 222 ¶ 3.)  Ampco-Pittsburgh Corporation ("Ampco"), a Pennsylvania corporation based in Pittsburgh, acquired PFC's stock in August 1979 and became Greenville's parent corporation.  (ECF No. 224 ¶ 20.)

Trinity Industries, Inc. ("Trinity"), is a Delaware corporation maintaining its principal place of business in Dallas, Texas.  (ECF No. 1 ¶ 1.)  Trinity Industries Railcar Corporation ("TIRC") and Waldorf Properties, Inc. ("Waldorf"), are wholly-owned subsidiaries of Trinity.  (ECF No. 223 ¶ 3.)  Greenville and Trinity executed a purchase and sale agreement on December 9, 1986.  (ECF No. 146-4.)  Pursuant to the terms of the agreement, Trinity acquired the North Plant.  (ECF No. 223 ¶ 4.)  Greenville agreed to change its corporate name to something other than the "Greenville Steel Car Company."  (ECF No. 146-4 at 26.)  In February 1987, Greenville formally amended its articles of incorporation and changed its name to the "Greenlease Holding Company" ("Greenlease").  (ECF No. 222 ¶ 13.)  With Greenville's change of name to Greenlease, Trinity could operate the North Plant under the fictitious name of the "Greenville Steel Car Company."  (ECF No. 1 ¶¶ 18-20; ECF No. 222 ¶ 50.)

After the acquisition, Trinity manufactured railcars at the North Plant.  (ECF No. 222 ¶ 15.)  These manufacturing activities continued until 2000, when Trinity's operations at the North Plant ceased.  (ECF No. 223 ¶¶ 6-7.)  In February 2004, Trinity sold the North Plant to Waldorf.  (ECF No. 1 ¶ 22.)  Waldorf continues to own the North Plant.  (ECF No. 223 ¶ 2.)  Although Greenlease continues to exist as a corporate entity, it constitutes only a shell holding company that does not engage in business or commercial activities.  (ECF No. 222 ¶ 14.)  Greenlease has no employees.  (*Id.*)

B. **Environmental**

In June 2004, the Environmental Crimes Section of the Pennsylvania Office of Attorney General's Bureau of Criminal Investigations commenced an investigation into waste disposal activities that had occurred at the North Plant.  (ECF No. 146-7 at 2.)  The purpose of the investigation, which resulted from a referral made by Mercer County District Attorney James P. Epstein,[1] was to determine whether the activities at the North Plant had been in compliance with Pennsylvania's Solid Waste Management Act ("SWMA"), 35 PA. STAT. § 6018.101 *et seq.* (ECF No. 146-7 at 2; ECF No. 146-8 at 1.)  As a part of the investigation, Special Agent William F. Brown ("Brown") interviewed several former Trinity employees.  (ECF No. 146-7 at 3-8; ECF No. 146-8 at 1-2.)  Some of the individuals interviewed in connection with the investigation had also been employees of Greenville prior to Trinity's acquisition of the North Plant.  (*Id.*)

On March 24, 2006, an investigative grand jury recommended that criminal proceedings be instituted against Trinity.  (ECF No. 146-7.)  One week later, Brown filed an eleven-count criminal complaint against Trinity for alleged violations of the SWMA.  (ECF No. 146-9.)  Trinity was charged with three second-degree felonies and eight third-degree misdemeanors.  (*Id.* at 2-5.)  Pursuant to the terms of a plea agreement executed on October 31, 2006, Trinity pleaded *nolo contendere* to five of the misdemeanor charges.  (ECF No. 146-10.)

The SWMA established the Solid Waste Abatement Fund ("SWAF"), which is administered for the "abatement or elimination of present or potential hazards to human health or to the environment from the improper treatment, transportation, storage, processing, or disposal

---

[1] Under Pennsylvania law, the Attorney General may initiate a criminal prosecution in a "county criminal court" [u]pon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his [or her] office. 71 PA. STAT. § 732-205(a)(3).

of solid wastes," and for the enforcement of the applicable statutory provisions.  35 PA. STAT. §

6018.701.  On December 21, 2006, Trinity was sentenced in state court to pay a $200,000.00

fine.  (ECF No. 146-11 at 1-2.)  In accordance with the SWMA, the fine was to be paid into the

SWAF.  (*Id.* at 1-2.)  Trinity was required to reimburse Pennsylvania's Department of

Environmental Protection ("DEP") for investigative costs totaling $54,502.55, and to contribute

$50,000.00 to a nonprofit organization (or multiple nonprofit organizations) selected by the

Attorney General of Pennsylvania.  (ECF No. 146-10 ¶¶ 4-5; ECF No. 146-11 at 2.)  In addition,

Trinity was ordered to remediate all contamination on its property.  (ECF No. 146-10 ¶ 7; ECF

No. 146-11 at 2.)  The orders entered by the Court of Common Pleas were consistent with the

terms of the plea agreement.  (ECF Nos. 146-10 & 146-11.)

On December 21, 2006, Trinity and the DEP executed a consent order and agreement

pursuant to the Hazardous Sites Cleanup Act ("HSCA"), 35 PA. STAT. § 6020.101 *et seq.*, the

Land Recycling and Environmental Remediation Standards Act ("LRERSA"), 35 PA. STAT. §

6026.101 *et seq.*, and the Administrative Code, 71 PA. STAT. § 510-17.[2]  (ECF No. 146-1.)

Trinity agreed to pay a civil penalty in the amount of $50,000.00 and assumed certain obligations

associated with the remediation of the environmental contamination of its property.  (ECF No.

146-1 ¶¶ 6-8, 22.)  The plea agreement incorporated the terms of the consent order by reference.[3]

(ECF No. 146-10 ¶ 7; ECF No. 146-11 at 2.)

Trinity and TIRC commenced this action against Greenlease and Ampco (collectively,

"defendants") on October 24, 2008, seeking redress under the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the

---

[2] The relevant statutory provisions empower the DEP to issue orders enforcing the applicable environmental standards.  35 PA. STAT. §§ 6020.1102(a), 6026.104(b); 71 PA. STAT. § 510-17.

[3] The property covered under the plea agreement, the sentence and the consent order included the North Plant and another property referred to as the "South Plant."  (ECF No. 146-1 ¶ 22; ECF No. 146-10 ¶ 7; ECF No. 146-11 at 2.) The instant action involves only the North Plant.

Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the HSCA. (ECF No. 1 ¶¶ 32-92.) In addition to the statutory claims, Trinity and TIRC (collectively "plaintiffs") brought common-law claims grounded in theories of contribution and negligence *per se*. (*Id.* ¶¶ 93-100.) The complaint contained requests for declaratory and monetary relief. (*Id.* ¶¶ 32-100.) Defendants answered plaintiffs' complaint on December 19, 2008, and asserted counterclaims for contribution and indemnity under the CERCLA and the common law of Pennsylvania. (ECF No. 9 at 18-19, ¶¶ 1-8.)

On September 14, 2009, defendants moved for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (ECF No. 28.) That motion was denied in a memorandum opinion and order dated January 29, 2010. (ECF No. 40.) Plaintiffs filed a motion for partial summary judgment on October 14, 2011. (ECF No. 96.) That same day, Greenlease and Ampco filed separate motions for summary judgment. (ECF Nos. 88 & 92.)

While the motions for summary judgment filed by the parties in this case were still pending, parallel claims asserted by plaintiffs in a separate action involving the South Plant, a related property, against Chicago Bridge & Iron Company ("Chicago Bridge") were dismissed. *Trinity Industries v. Chicago Bridge & Iron Co.*, 867 F.Supp.2d 754 (W.D.Pa. 2012). On April 11, 2012, plaintiffs appealed the dismissal of those claims to the United States Court of Appeals for the Third Circuit. (ECF No. 131-1.) Five days later, plaintiffs requested that this action be stayed while the court of appeals was considering their appeal in the other case. (ECF No. 131.) On September 13, 2012, the court stayed all proceedings in this case until the rendering of the court of appeals' decision. (ECF No. 139.) The pending motions for summary judgment were all denied without prejudice. (*Id.*)

On August 20, 2013, the court of appeals issued its decision and reinstated some of plaintiffs' claims against Chicago Bridge. *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131 (3d Cir. 2013). The order staying the proceedings in this case was lifted shortly thereafter. Trinity and TIRC filed a new motion for partial summary judgment on October 30, 2013. (ECF No. 151.) That same day, Greenlease and Ampco filed separate motions for summary judgment. (ECF Nos. 143 & 147.) In a memorandum opinion and order dated May 2, 2014, the court granted Ampco's motion for summary judgment and denied the plaintiffs' motion for partial summary judgment with respect to the claims asserted against Ampco. (ECF Nos. 235 & 236.) Ampco is no longer a defendant in this action. (ECF No. 236.) The cross-motions for summary judgment concerning the claims brought against Greenlease are still before the court and will be resolved in this memorandum opinion.

## III. <u>Standard of Review</u>

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact

could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond that party's pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in that party's pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.   Jurisdiction and Venue

The court has subject-matter jurisdiction over the federal claims asserted in this case pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 6971(a) and 42 U.S.C. § 9613(b). Supplemental jurisdiction over the state claims is predicated on 28 U.S.C. § 1367(a). Since there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, 28 U.S.C. § 1332(a)(1) supplies an alternative basis for the exercise of the court's subject-matter jurisdiction. Venue is proper under 28 U.S.C. § 1391(b), 42 U.S.C. § 6972(a) and 42 U.S.C. § 9613(b).

## V.   Discussion

In the opinion issued on May 2, 2014, the court concluded that plaintiffs could not hold Ampco directly or derivatively liable under the standards articulated by the United States Supreme Court in *United States v. Bestfoods*, 524 U.S. 51 (1998). (ECF No. 235 at 10-27.) Plaintiffs' inability to establish that Ampco had violated the applicable statutory provisions

necessitated the dismissal of the contribution and negligence *per se* claims asserted against Ampco. (*Id.* at 27-29.) The court entered an order dismissing Ampco as a defendant in this action. (ECF No. 236.) The unresolved issues in this case concern only the dispute between plaintiffs and Greenlease.

A.     **The CERCLA Claims**

In 1980 Congress enacted the CERCLA. Pub. L. No. 96-510; 94 Stat. 2767 (1980). The Supreme Court has described the CERCLA as "a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). Section 106(a) of the CERCLA, which is codified at 42 U.S.C. § 9606(a), permits the Attorney General to commence an abatement action "when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." Pub. L. No. 96-510, § 106(a); 94 Stat. 2767, 2780 (1980). A federal district court entertaining such an action may "grant such relief as the public interest and the equities of the case may require." 42 U.S.C. § 9606(a).

Section 107(a) of the CERCLA renders "four broad classes" of potentially responsible parties strictly liable for environmental contamination. *Burlington Northern & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608-09 (2009). That provision, which is codified at 42 U.S.C. § 9607(a), provides:

> **§ 9607. Liability**
> **(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date.** Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

8

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 104(i) [42 U.S.C. § 9604(i)].

The amounts recoverable in an action under this section shall include interest on the amounts recoverable under subparagraphs (A) through (D). Such interest shall accrue from the later of (i) the date of payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned. The rate of interest on the outstanding unpaid balance of the amounts recoverable under this section shall be the same rate as is specified for interest on investments of the Hazardous Substance Superfund established under subchapter A of chapter 98 of [the Internal Revenue Code of 1954 (1986), 26 U.S.C. § 9501 *et seq.*]. For purposes of applying such amendments to interest under this subsection, the term "comparable maturity" shall be determined with reference to the date on which interest accruing under this subsection commences.

42 U.S.C. § 9607(a). Although the CERCLA creates a federal cause of action permitting the recovery of cleanup costs from culpable entities, it "does not provide a general cause of action for all harm caused by toxic contaminants." *CTS Corp. v. Waldburger*, 134 S.Ct. 2175, 2180, 2188 (2014). The CERCLA "does not provide a complete remedial framework" for those who have suffered "personal injur[ies] or property damage." *Id.*

The original version of the CERCLA contained no express provision permitting a private party to seek contribution from other potentially responsible parties for the costs of a cleanup. *Key Tronic*, 511 U.S. at 816. Congress enacted the Superfund Amendments and Reauthorization

Act of 1986 ("SARA"), Pub. L. No. 99-499; 100 Stat. 1613 (1986), which amended the

CERCLA in order to authorize the commencement of contribution actions. Pub. L. No. 99-499,

§ 113; 100 Stat. 1613, 1647-1648 (1986). Section 113(f) of the CERCLA, which is codified at

42 U.S.C. § 9613(f), provides:

> **(f) Contribution.** (1) Contribution. Any person may seek contribution from any other person who is liable or potentially liable under section [107(a), 42 U.S.C. §] 9607(a)] . . ., during or following any civil action under section [106, 42 U.S.C. §] 9606 . . . or under section [107(a) [42 U.S.C. §] 9607(a) . . . . Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section [106 or section 107, 42 U.S.C.] § 9606 . . . or § 9607. . . .
> (2) Settlement. A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.
> (3) Persons not party to settlement.
>     (A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.
>     (B) A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).
>     (C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

42 U.S.C. § 9613(f). The enactment of § 9613(f) was precipitated by litigation concerning the

scope of § 9607(a). *Beazer East, Inc. v. Koppers Indus., Inc.*, 525 F.3d 255, 259 (3d Cir. 2008).

The statutory amendment was designed to codify a right of contribution that some courts had

previously found to be implicit in § 9607(a)'s remedial framework. *Raytheon Aircraft Co. v. United States*, 435 F.Supp.2d 1136, 1149-51 (D.Kan. 2006).

In their complaint, plaintiffs assert claims under §§ 9607(a)(4)(B), 9613(f)(1) and 9613(f)(3)(B). (ECF No. 1 ¶¶ 33, 46-54.) Greenlease moves for summary judgment with respect to all those claims. (ECF No. 143 ¶¶ 3(a)-3(d).) Plaintiffs move for partial summary judgment only with respect to their claims under §§ 9607(a)(4)(B) and 9613(f)(3)(B). (ECF No. 151 at 1.) Each claim will be separately considered.[4]

The plain language of § 9613(f)(1) provides that contribution from a liable or potentially liable party may be sought "during or following" a civil action commenced under § 9606 or § 9607. 42 U.S.C. § 9613(f)(1). In *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 165-68 (2004), the Supreme Court construed that language to mean that the commencement of an underlying civil action was a statutory prerequisite to a claim for contribution under § 9613(f)(1). The Supreme Court described the sentence providing that § 9613(f)(1) did not "diminish the right of any person to bring an action for contribution in the absence of a civil action" as a clarification that the provision did not constitute "the exclusive cause of action for contribution" available to potentially responsible parties. *Cooper Indus.*, 543 U.S. at 166-67. In this case, it is undisputed that no civil action under § 9606 or § 9607 has been brought against the plaintiffs. (ECF No. 223 ¶ 26.) Since plaintiffs have not been sued under those provisions, § 9613(f)(1) does not provide them with statutory claims for contribution. *Cooper Indus.*, 543

---

[4] In light of the intervening decision issued in *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131 (3d Cir. 2013), plaintiffs are no longer pursuing their claims under §§ 9607(a)(4)(B) and 9613(f)(1). (ECF No. 229 at 2-3.) Those claims nevertheless remain subject to pending motions for summary judgment. (ECF No. 143 ¶¶ 3(a)-3(b); ECF No. 151 at 1.) Since the court's consideration of the claims brought under § 9613(f)(3)(B) requires some discussion of §§ 9607(a)(4)(B) and 9613(f)(1) in any event, the merits of each claim will be discussed to some extent.

U.S. at 165-68. Greenlease's motion for summary judgment will be granted with respect to the claims brought under § 9613(f)(1). (ECF No. 1 ¶ 47; ECF No. 143 ¶ 3(b).)

In *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138-39 (2007), the Supreme Court recognized a distinction between a party's *recovery of costs* under § 9607(a) and a claim for *contribution* under § 9613(f). Elaborating on that distinction, the Supreme Court explained that "[w]hen a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response." *Atlantic Research Corp.*, 551 U.S. at 139. The Supreme Court went on to observe that a party in such a situation would be "eligible to seek contribution" under § 9613(f) even though it could not "simultaneously seek to recover the same expenses" under § 9607(a).[5] *Id.* Acknowledging that they cannot recover under both provisions, plaintiffs alternatively argue that they are entitled to recover under one or the other. (ECF No. 152 at 6.)

In *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 136-38 (3d Cir. 2013), which involved the cleanup of the plaintiffs' South Plant, the United States Court of Appeals for the Third Circuit held that the consent order at issue in this case constituted "an administrative or judicially approved settlement" resolving plaintiffs' liability to Pennsylvania "for some or all of a response action."[6] 42 U.S.C. § 9613(f)(3)(B). Because plaintiffs resolved their liability through the execution of such a settlement, they are not subject to counterclaims for contribution. 42 U.S.C. § 9613(f)(2). In *Agere Systems, Inc. v. Advanced Environmental Technology Corp.*, 602 F.3d 204, 227-29 (3d Cir. 2010), the court of appeals clarified that plaintiffs shielded from such counterclaims cannot seek to hold other parties jointly and severally

---

[5] While highlighting the distinction between the remedies available under § 9607(a) and the remedies available under § 9613(f), the Supreme Court has acknowledged that those remedies may overlap to some extent. *United States v. Atlantic Research Corp.*, 551 U.S. 128, 139 n.6 (2007); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 163 n.3 (2004); *Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994).

[6] Greenlease initially argued that the consent order had been outside of § 9613(f)(3)(B)'s ambit because the enforcement actions taken against plaintiffs had not arisen directly under the CERCLA. (ECF No. 143 ¶ 3(c).) Since that argument has already been rejected by the Court of Appeals, Greenlease no longer advances it as a basis for seeking summary judgment. (ECF No. 225 at 4-5.)

liable under § 9607(a).[7]  If plaintiffs were permitted to proceed under § 9607(a)(4)(B), they could hold Greenlease liable for the entire amount of the contamination without remaining subject to counterclaims under § 9613(f)(1) for their share of the blame.[8]  *Agere Systems*, 602 F.3d at 228-29.  Such a result would contradict a principal objective of the CERCLA, which is designed to distribute the costs of a cleanup among the parties responsible for creating or maintaining hazardous conditions.  *W.R. Grace & Co. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88-89 (2d Cir. 2009).  Since § 9613(f)(3)(B) itself incorporates the requirement of equitable distribution that lies at the heart of the CERCLA, plaintiffs' claims must be asserted under that provision. *Atlantic Research Corp.*, 551 U.S. at 138-40; *Agere Systems*, 602 F.3d at 227-29.  Greenlease's motion for summary judgment will be granted with respect to the claims brought under § 9607(a)(4)(B).  (ECF No. 1 ¶¶ 32-45; ECF No. 143 ¶ 3(a).)  To the extent that plaintiffs seek partial summary judgment with respect to their § 9607(a)(4)(B) claims, their motion will be denied.  (ECF No. 151 at 1.)

The CERCLA requires the President to "establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants. . . ."  42 U.S.C. § 9605(a).  The protocol established under the CERCLA, which was promulgated by the Environmental Protection Agency ("EPA"), constitutes one portion of a broader "national

---

[7] The Supreme Court has assumed (without deciding) that §  9607(a) provides for joint and several liability. *United States v. Atlantic Research Corp.*, 551 U.S. 128, 140 n.7 (2007).

[8] In *Trinity Industries, Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 133 (3d Cir. 2013), the United States Court of Appeals for the Third Circuit made no distinction between Trinity and TIRC.  Collectively referring to both plaintiffs as "Trinity," the court of appeals treated them both as settling parties.  *Chicago Bridge*, 735 F.3d at 133, 136-38.  The court notes that only Trinity is named in the consent order.  (ECF No. 146-1 at 1.)  Since neither the court of appeals nor the parties recognized or identified a distinction between the status of Trinity and the status of TIRC, the court will consider that both plaintiffs would be shielded from counterclaims for contribution.  42 U.S.C. § 9613(f)(2).  Given that plaintiffs are no longer pursuing relief under § 9607(a), further consideration of that issue is unnecessary.  (ECF No. 229 at 2-3.)

contingency plan."[9] *Cooper Indus.*, 543 U.S. at 161 n.2. In certain instances, a cleanup's consistency with the national contingency plan may determine whether costs can be recovered under the CERCLA. 42 U.S.C. § 9607(a)(4)(B). Greenlease moves for summary judgment with respect to plaintiffs' § 9613(f)(3)(B) claims on the ground that the cleanup activities undertaken at the North Plant were not consistent with the national contingency plan. (ECF No. 225 at 5-6.) Plaintiffs argue that consistency with the national contingency plan is not an element of a claim brought under § 9613(f)(3)(B). (ECF No. 229 at 3-10.) They maintain that in any event their cleanup activities were consistent with the national contingency plan. (ECF No. 214 at 8-10.)

Under § 9607(a), potentially responsible parties are strictly liable for costs falling within four different subsections. *Burlington Northern*, 556 U.S. at 608-09. Removal or remedial costs incurred by the United States, a State or an Indian tribe may be recovered as long as they are "*not inconsistent with* the national contingency plan." 42 U.S.C. § 9607(a)(4)(A)(emphasis added). The "necessary costs of response" voluntarily "incurred by any other person" must be "*consistent with* the national contingency plan" in order to be recoverable. 42 U.S.C. § 9607(a)(4)(B)(emphasis added). Two distinct subsections, which provide for the recovery of costs associated with damages to natural resources and specified health assessments, make no reference to the national contingency plan. 42 U.S.C. § 9607(a)(4)(C)-(D).

When Congress uses particular language in one provision but omits it from another provision of the same statute, courts generally presume that the language applies only within the context of the specific provision in which it appears. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452-53 (2002). Courts typically assume that Congress intends to establish different

_____

[9] Section 311(d) of the Water Pollution Control Act requires the President to "prepare and publish a National Contingency Plan" facilitating the "removal of oil and hazardous substances." 33 U.S.C. § 1321(d)(1). A revision of the "national contingency plan" known as the "national hazardous substance response plan" is required under the CERCLA. 42 U.S.C. § 9605(a).

rules of law when it employs different language in two separate provisions. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004). These two principles of statutory construction contradict Greenlease's assertion that costs must always been incurred in a manner that is "consistent with the national contingency plan" in order to be recoverable under the CERCLA. (ECF No. 144 at 8-11; ECF No. 207 at 7; ECF No. 218 at 4-7.) The omission of that language from two subsections of § 9607(a) strongly suggests that certain costs are recoverable even in the absence of such consistency. 42 U.S.C. § 9607(a)(4)(C)-(D). The different phraseology used in § 9607(a)(4)(A) indicates that costs incurred by the United States, a State or an Indian tribe are recoverable even if they depart from established protocols, provided that they are "*not inconsistent with* the national contingency plan." 42 U.S.C. § 9607(a)(4)(A)(emphasis added). If Congress had intended to make a cleanup's consistency with the national contingency plan a prerequisite to cost recovery in every instance, it would have used the modifying language in more than one subsection of § 9607(a). *Duncan v. Walker*, 533 U.S. 167, 173-74 (2001).

The CERCLA created sweeping remedies designed to force *everyone* who was potentially responsible for contamination to contribute to the costs of a cleanup. *Bestfoods*, 524 U.S. at 56 n.1. Under § 9607(a)(4)(B), a private party may recover costs voluntarily incurred during the course of a cleanup "without any establishment of liability to a third party." *Atlantic Research Corp.*, 551 U.S. at 139. In order to prevent private parties from incurring *unnecessary* costs and seeking reimbursement from other parties, Congress limited the statutory right of recovery to "necessary costs" incurred within the specific protocol prescribed by the national contingency plan. 42 U.S.C. § 9607(a)(4)(B). The national contingency plan operates "as a means of assuring that response actions [are] both cost-effective and environmentally sound." *Artesian Water Co. v. Gov't of New Castle Cnty.*, 659 F.Supp. 1269, 1291 n.42 (D.Del. 1987).

When a private party "resolve[s] its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement," the terms of the settlement independently provide the strictures needed to prevent the party from unnecessarily increasing the costs of a cleanup. 42 U.S.C. § 9613(f)(3)(B).

As discussed earlier, a party must be sued under § 9606 or § 9607 in order to assert a claim for contribution under § 9613(f)(1). *Cooper Indus.*, 543 U.S. at 165-68. A potentially responsible party sued under § 9607(a)(4)(B) may only be held liable for "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). When a party is sued under that particular provision, any claim for contribution brought against a distinct party under § 9613(f)(1) is dependent upon whether the plaintiff in the underlying action incurred costs in a manner that was consistent with the national contingency plan's requirements. *Id.* A potentially responsible party's right to contribution under § 9613(f) is "contingent upon an inequitable distribution of common *liability* among liable parties." *Atlantic Research Corp.*, 551 U.S. at 139 (emphasis added). Since a party's liability for costs under § 9607(a)(4)(B) turns on whether the incurring of those costs conformed to the national contingency plan, conformity with that plan may determine whether a right to contribution exists under § 9613(f)(1). *Public Serv. Co. of Colorado v. Gates Rubber Co.*, 175 F.3d 1177, 1181, n.5 (10th Cir. 1999).

Plaintiffs were not sued under § 9607(a)(4)(B). (ECF No. 223 ¶ 26.) Their claims for contribution are based on their *liability* under the consent order. *Atlantic Research Corp.*, 551 U.S. at 138 n.5. In *Chicago Bridge*, the court of appeals determined that the consent order constituted "an administrative or judicially approved settlement" resolving plaintiffs' liability to

Pennsylvania "for some or all of a response action." *Chicago Bridge*, 735 F.3d at 136-38; 42 U.S.C. § 9613(f)(3)(B). Section 9613(f)(3)(B) makes the settlement itself, rather than any party's compliance with the national contingency plan, the applicable predicate for contribution. *Cooper Indus.*, 543 U.S. at 163 (referring to the cause of action created by § 9613(f)(3)(B) as "a *separate* express right of contribution")(emphasis added). Since the contribution claims brought under § 9613(f)(3)(B) are not premised on an underlying action commenced against plaintiffs under § 9607(a)(4)(B), they remain viable regardless whether the terms of the consent order are consistent with the national contingency plan.

Although plaintiffs do not have to demonstrate that their actions were consistent with the national contingency plan in order to seek contribution under § 9613(f)(3)(B), they have done so in any event. The terms of the consent order were crafted in conformity with the HSCA and the LRERSA. (ECF No. 146-1 at 1, ¶ A.) The standards applicable under those statutes conform to the CERCLA's requirements. 35 PA. STAT. §§ 6020.504(a), 6026.106(a). In *Chicago Bridge*, which involved the consent order at issue in this case, the court of appeals specifically equated remediation under Pennsylvania law with remediation under the CERCLA. *Chicago Bridge*, 735 F.3d at 137. The consent order designated Joseph B. Gormley, Jr. ("Gormley"), of Golder Associates, Inc. ("Golder"), as the contractor responsible for performing, directing and supervising plaintiffs' work at the North and South Plants. (ECF No. 146-1 at 6, ¶ 4.) In an expert report submitted by Gormley on June 20, 2011, Golder stated that the work performed under the consent order had been consistent with the requirements of the national contingency plan. (ECF No. 216-1 at 19.) Greenlease points to nothing in the record which contradicts that statement.

Richard Barrett ("Barrett") testified on behalf of plaintiffs pursuant to Federal Rule of Civil Procedure 30(b)(6).  (ECF No. 146-3.)  During his deposition, Barrett stated that he was not familiar with the national contingency plan.  (*Id.* at 18.)  He responded in the negative when asked whether he was aware of efforts made by plaintiffs to ensure that Golder's employees were performing their work in accordance with the national contingency plan's requirements.  (*Id.*)  Greenlease characterizes Barrett's testimony as an "admission" that plaintiffs' remedial actions were not consistent with the national contingency plan.  (ECF No. 225 at 5.)  Contending that plaintiffs "made no attempt whatsoever" to comply with the "detailed requirements for each stage of the process," Greenlease maintains that "it is not necessary to delve into" those requirements in order to determine that plaintiffs' CERCLA claims are not viable.  (ECF No. 144.)

The argument advanced by Greenlease rests on the mistaken premise that a private party must *consciously* follow the prescribed protocol in order for its incurring of "necessary costs" to be "consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).  Under the EPA's regulations, a private party's "response action" is deemed to be "'consistent with the [national contingency plan]'" when it "is in *substantial* compliance with the applicable requirements . . . and results in a CERCLA-quality cleanup."  40 C.F.R. § 300.700(c)(3)(i)(emphasis added).  A "response action" carried out in compliance with an order or consent decree entered under the CERCLA is automatically considered to be consistent with the national contingency plan.  40 C.F.R. § 300.700(c)(ii).  The court of appeals has found the standards governing the consent order at issue in this case to be "virtually identical" to the standards applicable under the CERCLA.  *Chicago Bridge*, 735 F.3d at 137.  In light of that determination, it is beyond dispute that actions taken pursuant to the consent order are in

"substantial compliance" with the CERCLA's requirements. 40 C.F.R. § 300.700(c)(3)(i). Barrett's unawareness of those requirements has no bearing on whether plaintiffs *actually* incurred costs in a manner that was consistent with the national contingency plan. (ECF No. 146-3 at 18.)

Greenlease owned and operated an "onshore facility" within the meaning of the CERCLA. 42 U.S.C. § 9601(9), (18), (20). It is undisputed that Greenlease used and released products containing "hazardous substances." 42 U.S.C. § 9601(14); (ECF No. 224 ¶¶ 14-15.) The CERCLA renders potentially responsible parties strictly liable for the costs of a cleanup. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3d Cir. 1992). With respect to the contribution claims arising under § 9613(f)(3)(B), the court will deny the motion for summary judgment filed by Greenlease and grant the motion for partial summary judgment filed by plaintiffs. (ECF No. 1 ¶¶ 50-54; ECF No. 143 ¶ 3(c); ECF No. 151 at 1.) At this time, no opinion is expressed as to *how* the costs of remediation should be distributed among the parties. *Litgo New Jersey, Inc. v. Comm'r of the New Jersey Dept. of Envt'l Prot.*, 725 F.3d 369, 383 (3d Cir. 2013)(explaining that while the "CERCLA's strict liability regime may subject 'innocent' private parties to liability," courts must "allocate response costs based on equitable factors").

## B. The RCRA Claims

The RCRA is a "comprehensive environmental statute" empowering the EPA to "regulate hazardous wastes" in accordance with "rigorous safeguards and waste management procedures." *City of Chicago v. Envt'l Defense Fund*, 511 U.S. 328, 331 (1994). Section 7002(a)(1)(B) of the RCRA, which is codified at 42 U.S.C. § 6972(a)(1)(B), provides that

> any person may commence a civil action on his own behalf . . . against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or

present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).  A separate provision of § 6972(a) permits a federal district court[10] "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," or "to order such person to take such other action as may be necessary."  42 U.S.C. § 6972(a).  In *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484 (1996), the Supreme Court construed § 6972(a) to authorize the entry of both mandatory and prohibitory injunctions.

Plaintiffs' complaint includes claims under § 6972(a)(1)(B).  (ECF No. 1 ¶¶ 55-69.)  In the case involving the South Plant, plaintiffs asserted similar claims against Chicago Bridge.  Summary judgment was entered in favor of Chicago Bridge with respect to those claims.  *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 867 F.Supp.2d 754, 763-64 (W.D.Pa. 2012).  Since Chicago Bridge was no longer conducting activities at the South Plant, a prohibitory injunction restraining it from continuing to contaminate the property was not an option.  *Id.*  Although the issuance of a mandatory injunction requiring Chicago Bridge to take remedial action was possible, it was not deemed to be "necessary" because the cleanup had already begun pursuant to the terms of the consent order.  *Id.* at 764.  Referring to a mandatory injunction as an "extraordinary remedy" that was to be "granted sparingly by the courts," the court of appeals affirmed the decision granting summary judgment in favor of Chicago Bridge with respect to plaintiffs' RCRA claims.  *Chicago Bridge*, 735 F.3d at 138-40.

Unlike the relevant provisions of the CERCLA, § 6972(a)(1)(B) "was not intended to provide a remedy for past cleanup costs."  *Meghrig*, 516 U.S. at 485.  Plaintiffs did not show that

---

[10] The United States Court of Appeals for the Third Circuit recently held that federal district courts have exclusive jurisdiction to entertain claims brought under the RCRA.  *Litgo New Jersey, Inc. v. Comm'r of the New Jersey Dept. of Envt'l Prot.*, 725 F.3d 369, 394-98 (3d Cir. 2013).

Greenlease's active participation in the ongoing cleanup effort is "necessary" within the meaning of § 6972(a). *Chicago Bridge*, 735 F.3d at 140. In a supplemental brief filed after the court of appeals' issuance of its decision in *Chicago Bridge*, plaintiffs informed the court that they were no longer pursuing injunctive relief under the RCRA. (ECF No. 229 at 2-3.) Accordingly, the court will deny plaintiffs' motion for partial summary judgment, and grant Greenlease's motion for summary judgment, with respect to the RCRA claims. (ECF No. 1 ¶¶ 55-69; ECF No. 143 ¶¶ 4(a)-4(b); ECF No. 151 at 1.)

## C. The HSCA Claims

In addition to their federal claims, plaintiffs bring HSCA claims against Greenlease under 35 PA. STAT. §§ 6020.701, 6020.702, 6020.705 and 6020.1101. (ECF No. 1 ¶¶ 70-92.) Section 6020.1101 declares "[a] release of a hazardous substance" to be a "public nuisance." 35 § PA. STAT. § 6020.1101. That statutory provision renders "[a]ny person allowing such a release . . . liable for the response costs caused by the release." *Id.* A person's responsibility for such a release is controlled by section 6020.701(a), which provides:

§ 6020.701. Responsible person
(a) General rule.—Except for releases of hazardous substances expressly and specifically approved under a valid Federal or State permit, a person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:
(1) The person owns or operates the site:
    (i) when a hazardous substance is placed or comes to be located in or on a site;
    (ii) when a hazardous substance is located in or on the site, but before it is released; or
    (iii) during the time of the release or threatened release.
(2) The person generates, owns or possesses a hazardous substance and arranges by contract, agreement or otherwise for the disposal, treatment or transport for disposal or treatment of the hazardous substance.
(3) The person accepts hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person from which there is a release or a threatened release of a hazardous substance which causes the incurrence of response costs.

35 Pa. Stat. § 6020.701(a). A responsible person is subject to strict liability under section

6020.702(a), which provides:

> **§ 6020.702. Scope of liability**
> **(a) General rule.**—A person who is responsible for a release or threatened
> release of a hazardous substance from a site as specified in section 701 is strictly
> liable for the following response costs and damages which result from the release
> or threatened release or to which the release or threatened release significantly
> contributes:
> (1) Costs of interim response which are reasonable in light of the information
> available to the department at the time the interim response action was taken.
> (2) Reasonable and necessary or appropriate costs of remedial response incurred
> by the United States, the Commonwealth or a political subdivision.
> (3) Other reasonable and necessary or appropriate costs of response incurred by
> any other person.
> (4) Damages for injury to, destruction of or loss of natural resources within this
> Commonwealth or belonging to, managed by, controlled by or appertaining to the
> United States, the Commonwealth or a political subdivision. This paragraph
> includes the reasonable costs of assessing injury, destruction or loss resulting
> from such a release.
> (5) The cost of a health assessment or health effects study.

35 Pa. Stat. § 6020.702(a). In *Agere Systems*, the United States Court of Appeals for the Third

Circuit found the "cost recovery" available under section 6020.702(a)(3) to be "virtually

identical" to that available under § 9607(a)(4)(B) of the CERCLA. *Agere Systems*, 602 F.3d at

236.

Pursuant to 35 Pa. Stat. § 6020.705, a responsible party sued for cost recovery may

assert a claim for contribution under the following conditions:

> **§ 6020.705. Contribution**
> **(a) General rule.**—A person may seek contribution from a responsible person
> under section 701, during or following a civil action under section 507 or 1101.
> Claims for contribution shall be brought in accordance with this section and the
> Pennsylvania Rules of Civil Procedure. Nothing in this section shall diminish the
> right of a person to bring an action for contribution in the absence of a civil action
> under section 507 or 1101.
> **(b) Allocation.**—In a civil action in which a liable party seeks a contribution
> claim, the court, or the board in an action brought under section 507 or 1101, shall
> enter judgment allocating liability among the liable parties. Allocation shall not
> affect the parties' liability to the department. The burden is on each party to show

how liability should be allocated. In determining allocation under this section, the court or the board may use such equitable factors as it deems appropriate.

The trier of fact shall consider the following factors:

(1) The extent to which each party's contribution to the release of a hazardous substance can be distinguished.

(2) The amount of hazardous substance involved.

(3) The degree of toxicity of the hazardous substance involved.

(4) The degree of involvement of and care exercised by each party in manufacturing, treating, transporting and disposing of the hazardous substance.

(5) The degree of cooperation by each party with Federal, State or local officials to prevent harm to the public health or the environment.

(6) Knowledge by each party of the hazardous nature of the substance.

**(c) Settlements.—**

(1) When the department enters into an administrative or judicially approved settlement of a civil action brought under section 507 or 1101, the amount of the department's claim under that civil action shall be reduced by the amount of the consideration paid to the department or the allocated amount of the settling party's liability, whichever is less. A settlement shall not otherwise affect the department's claim under section 507 or 1101.

(2) A person who has resolved its liability to the department in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement unless the terms of the settlement provide otherwise. The settling party may seek contribution from a nonsettling party to recover the consideration paid in excess of its allocated share of liability as determined by the court or the board.

(3) When the department has obtained less than complete relief from a person who has resolved its liability to the department in an administrative or judicially approved settlement, the department may bring an action against a person who has not so resolved its liability. A nonsettling party may seek contribution from any other nonsettling party or any settling party as allowed under this section.

35 PA. STAT. § 6020.705(a)-(c) (footnotes omitted).[11] The consent order entered by the Court of Common Pleas preserved plaintiffs' protection from contribution claims under section 6020.705(c)(2). (ECF No. 146-1 at 22, ¶ 39.) The court of appeals has construed section 6020.705 to be materially indistinguishable from § 9613(f) of the CERCLA. *Agere Systems*, 602 F.3d at 236.

Trinity acquired the North Plant from Greenville pursuant to a purchase and sale agreement executed on December 9, 1986. (ECF No. 146-4; ECF No. 223 ¶ 4.) The HSCA was

---

[11] Subsection (d) of section 6020.705 mandates the pursuit of federal funds available to Pennsylvania under the CERCLA. 35 PA. STAT. § 6020.705(d).

signed into law on October 18, 1988. 1988 Pa. Laws 108. Greenlease moves for summary judgment on the ground that the HSCA does not retroactively apply. (ECF No. 143 ¶ 5; ECF No. 144 at 16-19; ECF No. 207 at 7; ECF No. 218 at 9-10.) Plaintiffs maintain that the HSCA has retroactive effect, and that they are entitled to summary judgment with respect to all their claims under that statute. (ECF No. 151 at 2; ECF No. 152 at 12-15; ECF No. 214 at 15-20; ECF No. 8-9; ECF No. 226 at 7-8.)

The CERCLA imposes liability upon parties responsible for contamination occurring before its effective date. *In the Matter of Penn Central Transp. Co.*, 944 F.2d 164, 166 n.1 (3d Cir. 1991). In most respects relevant to this case, the HSCA was modeled after the CERCLA. *Gen. Elec. Envt'l Servs., Inc. v. Envirotech Corp.*, 763 F.Supp. 113, 115 n.1 (M.D.Pa. 1991). The court of appeals has found the "cost recovery and contribution provisions" contained in the HSCA to be "virtually identical" to those contained in the CERCLA. *Agere Systems*, 602 F.3d at 236.

Greenlease attempts to distinguish the HSCA from the CERCLA by pointing out that several of the HSCA's provisions speak in the present tense even though the corresponding provisions of the CERCLA speak in the past tense. (ECF No. 144 at 16-19.) It is also worth noting that, under Pennsylvania law, "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 PA. CONS. STAT. § 1926. Nonetheless, the HSCA expressly defines the term "[o]wner or operator" as "[a] person who owns or operates or *has owned or operated* a site, or otherwise *controlled* activities at a site." 35 PA. STAT. § 6020.103 (emphasis added). That definition controls the reach of the provision imposing liability upon "[t]he person who *owns* or *operates* the site…." 35 PA. STAT. § 6020.701(a)(1)(emphasis added). In *Smith v. Weaver*, 665 A.2d 1215, 1221 (Pa.Super.Ct. 1995),

the Pennsylvania Superior Court construed the applicable statutory language "to include, as responsible persons, those who ha[d] . . . owned or operated a site" before the HSCA's effective date. A federal court presented with a question of state law generally should accord weight to decisions rendered by the intermediate appellate courts of the relevant State "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise...." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940); *Brown v. Tucci*, 960 F.Supp.2d 544, 570 n.8 (W.D.Pa. 2013). Given the holding in *Smith* and because there is no other persuasive data indicating the Pennsylvania Supreme Court would render a different decision, plaintiffs' HSCA claims remain viable despite the fact that the HSCA did not become effective until after the execution of the purchase and sale agreement. *Smith*, 665 A.2d at 1221.

In an attempt to undermine the import of *Smith*, Greenlease calls the court's attention to *Ingros v. BFG Electroplating & Manufacturing Co.*, 81 Pa. D. & C. 4th 481 (Pa.Ct.Comm.Pl. 2006). (ECF No. 144 at 18-19.) In *Ingros*, the Court of Common Pleas of Jefferson County held that the HSCA did not retroactively apply. *Ingros*, 81 Pa. D. & C. 4th at 494. That decision, however, made no reference to the superior court's earlier decision in *Smith*. *Id.* After supplemental jurisdiction over plaintiffs' HSCA claims against Chicago Bridge was declined in connection with the initial dismissal of the accompanying federal claims, plaintiffs refiled their HSCA claims in the Court of Common Pleas of Mercer County. (ECF No. 227-3 at 3-4.) In that action, the court of common pleas has already interpreted *Smith* to mean that the HSCA must be given retroactive effect. (*Id.* at 11-12.)

Greenlease moves for summary judgment with respect to the HSCA claims *solely* on the ground that the HSCA does not retroactively apply. (ECF No. 143 ¶ 5; ECF No. 144 at 16-19; ECF No. 207 at 7; ECF No. 218 at 9-10.) Plaintiffs move for partial summary judgment with

respect to all their HSCA claims. (ECF No. 151 at 2; ECF No. 152 at 12-15; ECF No. 214 at 15-20; ECF No. 220 at 8-9.) In light of the superior court's holding in *Smith*, Greenlease's motion for summary judgment will be denied with respect to the HSCA claims. *Smith*, 665 A.2d at 1221. The only remaining question is whether plaintiffs' motion for partial summary judgment should be granted with respect to those claims.

The undisputed facts of this case confirm that Greenlease "is responsible for a release or threatened release of a hazardous substance from a site." 35 PA. STAT. § 6020.702(a); (ECF No. 224 ¶¶ 14-15.) When construed in isolation, sections 6020.702(a) and 6020.1101 would appear to render Greenlease strictly liable for *all* resulting response costs. 35 PA. STAT. §§ 6020.702(a), 6020.1101. Nevertheless, the provisions of the HSCA are generally construed to be coterminous with the parallel provisions of the CERCLA. *Chicago Bridge*, 735 F.3d at 137; *Agere Systems*, 602 F.3d at 236. In *Atlantic Research*, the United States Supreme Court observed that a responsible party defending a claim under § 9607(a) "could blunt any inequitable distribution of costs" by filing a counterclaim under § 9613(f). *Atlantic Research*, 551 U.S. at 140. As a settling party, however, Trinity cannot be held liable "for contribution regarding matters addressed in the settlement." 35 PA. STAT. § 6020.705(c)(2). The consent order broadly preserves Trinity's "protection from claims for contribution." (ECF No. 146-1 at 22, ¶ 39.) The "matters addressed in the settlement" include all response actions taken (and response costs incurred) at the North and South Plants. (*Id.*) Because Trinity is shielded from counterclaims for contribution, the reasoning employed in *Agere Systems* would appear to suggest that Trinity must pursue contribution claims under section 6020.705(c)(2) rather than seek to hold Greenlease

jointly and severally liable under sections 6020.701, 6020.702 and 6020.1101.[12] *Agere Systems*, 602 F.3d at 228-29.

Unlike Trinity, TIRC is not specifically named as a party to the consent order. (ECF No. 146-1 at 1). In *Chicago Bridge*, the court of appeals did not distinguish between Trinity and TIRC. *Chicago Bridge*, 735 F.3d at 133. Collectively referring to plaintiffs as "Trinity," the court of appeals treated them both as settling parties. *Id.* at 133, 136-38. The parties to this case identified no distinction between the status of Trinity and the status of TIRC. As far as the court can tell, TIRC would likewise enjoy statutory protection from counterclaims for contribution. 35 PA. STAT. § 6020.705(c)(2). If that is the case, TIRC cannot hold Greenlease jointly and severally liable under the remaining provisions of the HSCA. *Agere Systems*, 602 F.3d at 228-29.

Greenlease's motion for summary judgment, which is premised solely on a belief that the HSCA has no retroactive effect, does not distinguish between the different provisions of the HSCA relied upon by plaintiffs. (ECF No. 143 ¶ 5.) A nonmoving party must ordinarily be provided with notice of a potential ground for summary judgment before that ground is invoked by a court as a basis for granting a motion for summary judgment filed on other grounds. FED. R. CIV. P. 56(f)(2). Since the parties did not discuss the differences between the applicable provisions of the HSCA in their respective briefs, the court will not dismiss any of plaintiffs' HSCA claims at this time. Nonetheless, plaintiffs' motion for partial summary judgment will be denied with respect to the claims asserted under sections 6020.701, 6020.702 and 6020.1101. (ECF No. 1 ¶¶ 70-86; ECF No. 151 at 2.) That motion will be granted with respect to the contribution claims brought under section 6020.705(c)(2). (ECF No. 1 ¶¶ 87-92.) The court

---

[12] Because the issue has not been briefed by the parties, the court will consider (without deciding) that those provisions would subject Greenlease to joint and several liability. *United States v. Atl. Research Corp.*, 551 U.S. 128, 140 n.7 (2007).

expresses no opinion as to *how* responsibility for the contamination at the North Plant should be allocated among the parties.  35 PA. STAT. § 6020.705(b).

### D.     The Common-Law Contribution Claims

In addition to their statutory contribution claims under the CERCLA and the HSCA, plaintiffs assert common-law contribution claims against Greenlease.  (ECF No. 1 ¶¶ 93-95.) Greenlease moves for summary judgment with respect to those claims.  (ECF No. 143 ¶ 6.)  The common-law contribution claims are not included within plaintiffs' motion for partial summary judgment.  (ECF No. 151.)

Article VI of the United States Constitution declares "the Laws of the United States" to be "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. CONST., ART. VI.  "A fundamental principle of the Constitution is that Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Congress can preempt state law by explicitly declaring its intention to do so within the text of a federal statute.  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-96 (1983).  Even in the absence of an explicit preemption provision, state law is preempted to the extent that it "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively."  *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Field preemption may be found where the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where "the federal interest is so dominant that the federal system will be assumed to preclude [the] enforcement of state laws on the same subject."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  When Congress does not intend for federal law to occupy a field exclusively, state law is nevertheless preempted "to the extent that it actually conflicts with federal law."

*California  v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989).  Conflict preemption may occur where concurrent compliance with federal and state law is impossible, or "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

Greenlease argues that the CERCLA preempts common-law claims for contribution. (ECF No. 143  ¶ 6; ECF No. 144 at 20.)  The CERCLA contains a provision clarifying that nothing contained therein "shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State."  42 U.S.C. § 9614(a).  In light of that clear expression of legislative intent, it is axiomatic that the CERCLA does not preempt every state law governing the same subject matter.  *Manor Care, Inc. v. Yaskin*, 950 F.2d 122, 125 (3d Cir. 1991).  The existence of a federal statutory provision preserving state regulatory authority in a given area does not foreclose a finding of conflict preemption.  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869-70 (2000).  The Supreme Court has "decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law."  *United States v. Locke*, 529 U.S. 89, 106 (2000). Because the "statutory right of contribution" provided under § 9613(f) constitutes one part of "an elaborate settlement scheme aimed at the efficient resolution of environmental disputes," the United States Court of Appeals for the Third Circuit has held that the CERCLA preempts common-law contribution claims arising under state law.  *In re: Reading Co.*, 115 F.3d 1111, 1117 (3d Cir. 1997).  Since plaintiffs' common-law contribution claims are preempted by the CERCLA, Greenlease's motion for summary judgment will be granted with respect to those

claims.[13]  *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 685 (3d Cir. 2003); *Degussa*

*Constr. Chems. Operations, Inc. v. Berwind Corp.*, 280 F.Supp.2d 393, 411 (E.D.Pa. 2003);

*M&M Realty Co. v. Eberton Terminal Corp.*, 977 F.Supp. 683, 689 (M.D.Pa. 1997); (ECF No. 1

¶¶ 93-95; ECF No. 143 ¶ 6.)

  E.  **The Negligence *Per Se* Claims**

  The Pennsylvania Supreme Court has defined "negligence" as "the absence of ordinary

care that a reasonably prudent person would exercise in the same or similar circumstances."

*Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998).  Liability for negligence generally arises when

there are facts establishing a "breach of a legally recognized duty or obligation of the defendant

that is causally connected to actual damages suffered by the plaintiff."  *Scampone v. Highland*

*Park Care Center, LLC*, 57 A.3d 582, 596 (Pa. 2012).  Every cause of action for negligence "is

premised on the existence of a duty owed by one party to another."  *Gibbs v. Ernst*, 647 A.2d

882, 890 (Pa. 1994).  The "duty of care" owed by the defendant to the plaintiff is often rooted in

"amorphous public policy considerations."  *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000).

  In certain instances, the relevant duty may be defined by "an applicable statute, ordinance

or regulation designed to prevent a public harm."  *Cabiroy v. Scipione*, 767 A.2d 1078, 1079

(Pa.Super.Ct. 2001).  A defendant's failure to comply with a legal prescription can sometimes

establish as a matter of law that he or she has breached a duty of care owed to the plaintiff.  *Al's*

*Cafe, Inc. v. Sanders Ins. Agency*, 820 A.2d 745, 750 (Pa.Super.Ct. 2003).  Where a statutory

violation amounts to such a breach, the defendant's conduct constitutes "negligence *per se*"

under Pennsylvania law.  *Campo v. St. Luke's Hosp.*, 755 A.2d 20, 25 (Pa.Super.Ct. 2000);

*Commonwealth of Pa., Dept. of Pub. Welfare v. Hickey*, 582 A.2d 734, 736 (Pa.Commw.Ct.

---

[13] In light of this determination, the court has no occasion to consider Greenlease's alternative argument concerning
the alleged limitation of the common-law contribution remedy to cases involving joint tortfeasors.  (ECF No. 143 ¶
6; ECF No. 144 at 19-20; ECF No. 218 at 10.)

1990). A plaintiff attempting to recover under a theory of negligence *per se* must demonstrate that his or her injuries were proximately caused by the defendant's unlawful conduct. *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1058-59 (Pa.Super.Ct. 2003).

Plaintiffs assert negligence *per se* claims against Greenlease in this case. (ECF No. 1 ¶¶ 96-100.) Those claims are premised on alleged violations of the CERCLA, the RCRA and the HSCA. (*Id.*) "A federal [statute or] regulation may establish the standard of care appropriate to the underlying tort of negligence *per se* under [Pennsylvania] law." *Hassett v. Dafoe*, 74 A.3d 202, 216 (Pa.Super.Ct. 2013). Each of the three statutes will be considered for the purpose of determining whether plaintiffs' negligence *per se* claims are viable.

The HSCA declares it to be "unlawful" for a person to "[c]ause or allow a release of a hazardous substance," or to "[c]ause or allow [a] release of a contaminant in a manner that creates a public nuisance." 35 PA. STAT. § 6020.1108(1), (7). Plaintiffs' negligence *per se* claims appear to be predicated primarily on "violations" of those provisions. (ECF No. 1 ¶¶ 96-100.) As discussed earlier, however, the HSCA was not enacted until 1988. 1988 Pa. Laws 108. Greenlease's activities at the North Plant ceased on or before December 9, 1986. (ECF No. 146-4; ECF No. 223 ¶ 4.) The HSCA has retroactive effect to the extent that it renders previous owners and operators "responsible" for the costs of a cleanup. *Smith*, 665 A.2d at 1221. That effect does not mean that a pre-enactment "violation" of the HSCA can establish that such an owner or operator has been negligent *per se*. Negligence *per se* simply a recognizes that there are circumstances under which a plaintiff by certain means can establish the "duty" and "breach" elements necessary to recover under a theory of negligence. *Fiorentino v. Cabot Oil & Gas Corp.*, 750 F.Supp.2d 506, 515 (M.D.Pa. 2010). The statute creates the requisite "duty" owed to the plaintiff, and the defendant's violation of that statute constitutes the "breach" necessary to

establish his or her negligence. *J.E.J. v. Tri-County Big Brothers/Big Sisters*, 692 A.2d 582, 585 (Pa.Super.Ct. 1997); *Alfred M. Lutheran Distrib., Inc. v. A.P. Weilersvacher, Inc.*, 650 A.2d 83, 91 (Pa.Super.Ct. 1994). It is difficult to fathom how a person can *breach* a "duty" created by a statute that does not yet exist.

Even if the HSCA had been in effect at the time of Greenlease's conduct, it is not clear that the mere commission of an act declared to be "unlawful" thereunder could have established that Greenlease was negligent. Distinguishing negligence *per se* claims from those grounded in theories of strict liability, the superior court has held that an "excused violation" of a statutory provision does not constitute negligence *per se* under Pennsylvania law. *Bumbarger v. Kaminsky*, 457 A.2d 552, 554-55 (Pa.Super.Ct. 1983). The doctrine of negligence *per se* does not impose liability without fault. *McCloud v. McLaughlin*, 837 A.2d 541, 544-45 (Pa.Super.Ct. 2003). A plaintiff bringing a negligence *per se* claim must "establish that his [or her] complained of injuries were proximately caused by the statutory violations" allegedly committed by the defendant. *Congini v. Portersville Valve Co.*, 470 A.2d 515, 518 n.4 (Pa. 1983).

The HSCA creates "a rebuttable presumption of law that a person who causes or allows the release of a hazardous substance shall be liable, without proof of fault, negligence, or causation, for all damages, contamination or pollution within 2,500 feet of the perimeter of the area where the release has occurred."[14] 35 PA. STAT. § 6020.1109. The manner in which the HSCA defines "unlawful" conduct appears to be fundamentally inconsistent with plaintiffs' assertion that a mere "release of a hazardous substance" can constitute the statutory "violation" necessary to render a defendant negligent *per se*. 35 PA. STAT. § 6020.1108(1). Given that the HSCA was not in effect during the relevant period of time, the court need not decide whether it

---

[14] "This presumption may be overcome by clear and convincing evidence that the person so charged did not contribute to the damage, contamination or pollution." 35 PA. STAT. § 6020.1109.

establishes "duties" defining standards of care enforceable under the law of negligence.[15]  It suffices to say that plaintiffs would have had to surmount additional hurdles to recover under a theory of negligence *per se* even if the HSCA had governed Greenlease's activities at the North Plant.  *Shamnoski v. PG Energy*, 858 A.2d 589, 601-02 (Pa. 2004)(explaining that a statute can define the applicable standard of care in its own right only if it is sufficiently specific to provide concrete guidance extending beyond that provided by ordinary principles of negligence).

The negligence *per se* claims asserted in this case also appear to be premised on alleged violations of the CERCLA and the RCRA.  (ECF No. 1 ¶ 97.)  Under Pennsylvania law, negligence *per se* claims can arise only under statutory provisions exhibiting "an intention to protect specific groups from specific types of harm."  *Schemberg v. Smicherko*, 85 A.3d 1071, 1075 (Pa.Super.Ct. 2014).  Plaintiffs maintain that the CERCLA and the RCRA "operate to protect persons who incur costs to respond to contamination attributable to others."  (ECF No. 214 at 21.)  That argument is problematic because the contamination at the North Plant is at least partially attributable to plaintiffs.[16]  Their injuries arise not from the contamination itself, but rather from their own *liability* for that contamination.  In this respect, the damages suffered by plaintiffs are a full step removed from those suffered by individuals who are *directly* harmed by violations of statutes designed to protect the environment.  *Fiorentino*, 750 F.Supp.2d at 509-10, 515-16 (denying a motion to strike allegations pertaining to negligence *per se* claims in a case involving plaintiffs who had allegedly "experienced property damage and physical illness," "live[d] in constant fear of future illness," and "suffer[ed] severe emotional distress" due to the release of methane, natural gas, and other toxins near their property).  The argument advanced by

---

[15] The Pennsylvania Superior Court's decision in *Centolanza v. Lehigh Valley Dairies, Inc.*, 635 A.2d 143, 477-79 (Pa.Super.Ct. 1993), provides some support for plaintiffs' view that environmental statutes structured like the HSCA can define the applicable standard of care.

[16] The consent order conclusively establishes that Trinity is "responsible" for the release of hazardous substances at the North and South Plants.  (ECF No. 146-1 at 2, ¶ H.)

plaintiffs is clearly inapplicable to the RCRA.  As the United States Supreme Court explained in *Meghrig*, the "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards."  *Meghrig*, 516 U.S. at 483.  Instead, its purpose is to "minimize the present and future threat to human health and the environment" posed by "the generation of hazardous waste."  42 U.S.C. § 6902(b).

In order to recover under a theory of negligence *per se*, plaintiffs must demonstrate that Greenlease was somehow at fault for the contamination found at the North Plant.  *Bumbarger*, 457 A.2d at 554-55.  The "strict liability regime" established by the CERCLA "may subject 'innocent' private parties to liability."  *Litgo New Jersey, Inc.*, 725 F.3d at 383 (citing *United States v. Atl. Research Corp.*, 551 U.S. 128, 136 (2007).  Because the CERCLA is an environmental statute that is not tailored to "protect a particular class of individuals," it does not establish the applicable standard of care for purposes of negligence law.  *Wagner v. Anzon, Inc.*, 684 A.2d 570, 574-75 (Pa.Super.Ct. 1996).  Greenlease's motion for summary judgment will be granted with respect to all of plaintiffs' negligence *per se* claims.[17]  (ECF No. 1 ¶¶ 96-100; ECF No. 143 ¶ 7.)

## VI.  <u>Conclusion</u>

For the foregoing reasons, each of the pending motions for summary judgment will be granted in part and denied in part.  Greenlease's motion for summary judgment (*ECF No. 143*) will be granted with respect to the claims arising under §§ 9607(a)(4)(B) and 9613(f)(1) of the CERCLA (*ECF No. 1 ¶¶ 32-49*), the RCRA claims (*ECF No. 1 ¶¶ 55-69*), the common-law contribution claims (*ECF No. 1 ¶¶ 93-95*), and the negligence *per se* claims (*ECF No. 1 ¶¶ 96-*

---

[17] Since plaintiffs' negligence claims are premised solely on alleged "violations" of the HSCA, the CERCLA and the RCRA, the court has no occasion to consider whether Greenlease's actions were negligent under the "traditional reasonable person standard."  *Shamnoski v. PG Energy*, 858 A.2d 589, 602 (Pa. 2004).

*100*).  Plaintiffs' motion for partial summary judgment (*ECF No. 151*) will be granted with respect to the statutory contribution claims arising under § 9613(f)(3)(B) of the CERCLA (*ECF No. 1 ¶¶ 50-54*) and section 6020.705(c)(2) of the HSCA (*ECF No. 1 ¶¶ 87-92*).  The motions will be denied in all other respects.  Both motions will be denied *without prejudice* with respect to the claims brought under sections 6020.701, 6020.702 and 6020.1101 of the HSCA (*ECF No. 1 ¶¶ 70-86*).  An appropriate order will be entered.

By the court:

/s/ JOY FLOWERS CONTI
joy Flowers Conti
Chief United States District Judge

Dated:  August 5, 2014